BROWN ET AL. v. PRO FOOTBALL, INC., DBA
WASHINGTON REDSKINS, ET AL.

No. 95–388.   Argued March 27, 1996—Decided June 20, 1996

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, and GINS-BURG, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 252.

*Kenneth W. Starr* argued the cause for petitioners. With him on the briefs were *Paul T. Cappuccio, Steven G. Bradbury, Joseph A. Yablonski,* and *Daniel B. Edelman.*

*Deputy Solicitor General Wallace* argued the cause for the United States et al. as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Bingaman, Deputy Assistant Attorney General Klein, Paul R. Q. Wolfson, Robert J. Nicholson, Robert J. Wiggers,* and *David C. Shonka.*

*Gregg H. Levy* argued the cause for respondents. With him on the brief were *Herbert Dym, Sonya D. Winner,* and *Robert A. Long, Jr.**

JUSTICE BREYER delivered the opinion of the Court.

The question in this case arises at the intersection of the Nation's labor and antitrust laws. A group of professional

---

*Briefs of *amici curiae* urging reversal were filed for the National Hockey League Players Association et al. by *Simon P. Gourdine, Laurence Gold, Virginia A. Seitz, James W. Quinn,* and *Jeffrey L. Kessler;* and for the Screen Actors Guild, Inc., et al. by *David Alter.*

Briefs of *amici curiae* urging affirmance were filed for the Alliance of Motion Picture and Television Producers by *Richard M. Cooper;* for the American Trucking Associations by *Mark I. Levy* and *Daniel R. Barney;* for the Associated General Contractors of America, Inc., by *Charles E. Murphy, John G. Roberts, Jr.,* and *Michael E. Kennedy;* for the Bituminous Coal Operators' Association, Inc., by *Charles P. O'Connor, Peter Buscemi,* and *Stanley F. Lechner;* for the Carriers Container Council, Inc., et al. by *C. Peter Lambos, Robert J. Attaway, Donato Caruso,* and *Robert S. Zuckerman;* for the Chamber of Commerce of the United States et al. by *Zachary D. Fasman, Neal D. Mollen, Jenny C. Wu, Stephen A. Bokar, Robin S. Conrad, Jan S. Amundson,* and *Quentin Riegel;* for the League of Voluntary Hospitals and Homes of New York et al. by *Howard L. Ganz* and *Steven C. Krane;* for the National Basketball Association by *Jeffrey A. Michkin* and *Richard W. Buchanan;* for the National Electrical Contractors Association, Inc., by *Gary L. Lieber;* for the National Hockey League by *Frank Rothman;* for the National Railway Labor Conference by *Richard T. Conway, Ralph J. Moore, Jr., David P. Lee,* and *Joanna Moorhead;* and for the Office of the Commissioner of Baseball et al. by *Randy L. Levine* and *Thomas J. Ostertag.*

football players brought this antitrust suit against football club owners. The club owners had bargained with the players' union over a wage issue until they reached impasse. The owners then had agreed among themselves (but not with the union) to implement the terms of their own last best bargaining offer. The question before us is whether federal labor laws shield such an agreement from antitrust attack. We believe that they do. This Court has previously found in the labor laws an implicit antitrust exemption that applies where needed to make the collective-bargaining process work. Like the Court of Appeals, we conclude that this need makes the exemption applicable in this case.

## I

We can state the relevant facts briefly. In 1987, a collective-bargaining agreement between the National Football League (NFL or League), a group of football clubs, and the NFL Players Association, a labor union, expired. The NFL and the Players Association began to negotiate a new contract. In March 1989, during the negotiations, the NFL adopted Resolution G–2, a plan that would permit each club to establish a "developmental squad" of up to six rookie or "first-year" players who, as free agents, had failed to secure a position on a regular player roster. See App. 42. Squad members would play in practice games and sometimes in regular games as substitutes for injured players. Resolution G–2 provided that the club owners would pay all squad members the same weekly salary.

The next month, April, the NFL presented the developmental squad plan to the Players Association. The NFL proposed a squad player salary of $1,000 per week. The Players Association disagreed. It insisted that the club owners give developmental squad players benefits and protections similar to those provided regular players, and that they leave individual squad members free to negotiate their own salaries.

Two months later, in June, negotiations on the issue of developmental squad salaries reached an impasse. The NFL then unilaterally implemented the developmental squad program by distributing to the clubs a uniform contract that embodied the terms of Resolution G–2 and the $1,000 proposed weekly salary. The League advised club owners that paying developmental squad players more or less than $1,000 per week would result in disciplinary action, including the loss of draft choices.

In May 1990, 235 developmental squad players brought this antitrust suit against the League and its member clubs. The players claimed that their employers' agreement to pay them a $1,000 weekly salary violated the Sherman Act. See 15 U. S. C. § 1 (forbidding agreements in restraint of trade). The Federal District Court denied the employers' claim of exemption from the antitrust laws; it permitted the case to reach the jury; and it subsequently entered judgment on a jury treble-damages award that exceeded $30 million. The NFL and its member clubs appealed.

The Court of Appeals (by a split 2-to-1 vote) reversed. The majority interpreted the labor laws as "waiv[ing] antitrust liability for restraints on competition imposed through the collective-bargaining process, so long as such restraints operate primarily in a labor market characterized by collective bargaining." 50 F. 3d 1041, 1056 (CADC 1995). The court held, consequently, that the club owners were immune from antitrust liability. We granted certiorari to review that determination. Although we do not interpret the exemption as broadly as did the Appeals Court, we nonetheless find the exemption applicable, and we affirm that court's immunity conclusion.

## II

The immunity before us rests upon what this Court has called the "nonstatutory" labor exemption from the antitrust laws. *Connell Constr. Co.* v. *Plumbers,* 421 U. S. 616, 622 (1975); see also *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676

(1965); *Mine Workers* v. *Pennington,* 381 U. S. 657 (1965). The Court has implied this exemption from federal labor statutes, which set forth a national labor policy favoring free and private collective bargaining, see 29 U. S. C. § 151; *Teamsters* v. *Oliver,* 358 U. S. 283, 295 (1959); which require good-faith bargaining over wages, hours, and working conditions, see 29 U. S. C. §§ 158(a)(5), 158(d); *NLRB* v. *Wooster Div. of Borg-Warner Corp.,* 356 U. S. 342, 348–349 (1958); and which delegate related rulemaking and interpretive authority to the National Labor Relations Board (Board), see 29 U. S. C. § 153; *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 242–245 (1959).

This implicit exemption reflects both history and logic. As a matter of history, Congress intended the labor statutes (from which the Court has implied the exemption) in part to adopt the views of dissenting Justices in *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443 (1921), which Justices had urged the Court to interpret broadly a different *explicit* "statutory" labor exemption that Congress earlier (in 1914) had written directly into the antitrust laws. *Id.,* at 483–488 (Brandeis, J., joined by Holmes and Clarke, JJ., dissenting) (interpreting § 20 of the Clayton Act, 38 Stat. 738, 29 U. S. C. § 52); see also *United States* v. *Hutcheson,* 312 U. S. 219, 230–236 (1941) (discussing congressional reaction to *Duplex*). In the 1930's, when it subsequently enacted the labor statutes, Congress, as in 1914, hoped to prevent judicial use of antitrust law to resolve labor disputes—a kind of dispute normally inappropriate for antitrust law resolution. See *Jewel Tea, supra,* at 700–709 (opinion of Goldberg, J.); *Marine Cooks* v. *Panama S. S. Co.,* 362 U. S. 365, 370, n. 7 (1960); A. Cox, Law and the National Labor Policy 3–8 (1960); cf. *Duplex, supra,* at 485 (Brandeis, J., dissenting) (explicit "statutory" labor exemption reflected view that "Congress, not the judges, was the body which should declare what public policy in regard to the industrial struggle demands"). The implicit ("nonstatutory") exemption interprets the labor statutes in

accordance with this intent, namely, as limiting an antitrust court's authority to determine, in the area of industrial conflict, what is or is not a "reasonable" practice. It thereby substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations as to the appropriate legal limits of industrial conflict. See *Jewel Tea, supra,* at 709–710.

As a matter of logic, it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable. Thus, the implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions. See *Connell, supra,* at 622 (federal labor law's "goals" could "never" be achieved if ordinary anti-competitive effects of collective bargaining were held to violate the antitrust laws); *Jewel Tea, supra,* at 711 (national labor law scheme would be "virtually destroyed" by the routine imposition of antitrust penalties upon parties engaged in collective bargaining); *Pennington, supra,* at 665 (implicit exemption necessary to harmonize Sherman Act with "national policy . . . of promoting 'the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation'") (quoting *Fibreboard Paper Products Corp.* v. *NLRB,* 379 U. S. 203, 211 (1964)).

The petitioners and their supporters concede, as they must, the legal existence of the exemption we have described. They also concede that, where its application is necessary to make the statutorily authorized collective-bargaining process work as Congress intended, the exemption must apply both to employers and to employees.

Accord, *Volkswagenwerk Aktiengesellschaft* v. *Federal Maritime Comm'n,* 390 U. S. 261, 287, n. 5 (1968) (Harlan, J., concurring); *Jewel Tea, supra,* at 729–732, 735 (opinion of Goldberg, J.); Brief for AFL–CIO as *Amicus Curiae* in *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters,* O. T. 1981, No. 81–334, pp. 16–17; see also P. Areeda & H. Hovenkamp, Antitrust Law ¶ 229'd (1995 Supp.) (collecting recent Court of Appeals cases); cf. *H. A. Artists & Associates, Inc.* v. *Actors' Equity Assn.,* 451 U. S. 704, 717, n. 20 (1981) (explicit "statutory" exemption applies only to "bona fide labor organization[s]"). Nor does the dissent take issue with these basic principles. See *post,* at 253–254. Consequently, the question before us is one of determining the exemption's scope: Does it apply to an agreement among several employers bargaining together to implement after impasse the terms of their last best good-faith wage offer? We assume that such conduct, as practiced in this case, is unobjectionable as a matter of labor law and policy. On that assumption, we conclude that the exemption applies.

Labor law itself regulates directly, and considerably, the kind of behavior here at issue—the postimpasse imposition of a proposed employment term concerning a mandatory subject of bargaining. Both the Board and the courts have held that, after impasse, labor law permits employers unilaterally to implement changes in pre-existing conditions, but only insofar as the new terms meet carefully circumscribed conditions. For example, the new terms must be "reasonably comprehended" within the employer's preimpasse proposals (typically the last rejected proposals), lest by imposing more or less favorable terms, the employer unfairly undermined the union's status. *Storer Communications, Inc.,* 294 N. L. R. B. 1056, 1090 (1989); *Taft Broadcasting Co.,* 163 N. L. R. B. 475, 478 (1967), enf'd, 395 F. 2d 622 (CADC 1968); see also *NLRB* v. *Katz,* 369 U. S. 736, 745, and n. 12 (1962). The collective-bargaining proceeding itself must be free of

any unfair labor practice, such as an employer's failure to have bargained in good faith. See *Akron Novelty Mfg. Co.*, 224 N. L. R. B. 998, 1002 (1976) (where employer has not bargained in good faith, it may not implement a term of employment); 1 P. Hardin, The Developing Labor Law 697 (3d ed. 1992) (same). These regulations reflect the fact that impasse and an accompanying implementation of proposals constitute an integral part of the bargaining process. See *Bonanno Linen Serv., Inc.*, 243 N. L. R. B. 1093, 1094 (1979) (describing use of impasse as a bargaining tactic), enf'd, 630 F. 2d 25 (CA1 1980), aff'd, 454 U. S. 404 (1982); *Colorado-Ute Elec. Assn.*, 295 N. L. R. B. 607, 609 (1989), enf. denied on other grounds, 939 F. 2d 1392 (CA10 1991), cert. denied, 504 U. S. 955 (1992).

Although the case law we have cited focuses upon bargaining by a single employer, no one here has argued that labor law does, or should, treat multiemployer bargaining differently in this respect. Indeed, Board and court decisions suggest that the joint implementation of proposed terms after impasse is a familiar practice in the context of multiemployer bargaining. See, *e. g.*, *El Cerrito Mill & Lumber Co.*, 316 N. L. R. B. 1005 (1995); *Paramount Liquor Co.*, 307 N. L. R. B. 676, 686 (1992); *NKS Distributors, Inc.*, 304 N. L. R. B. 338, 340–341 (1991), rev'd, 50 F. 3d 18 (CA9 1995); *Sage Development Co.*, 301 N. L. R. B. 1173, 1175 (1991); *Walker Constr. Co.*, 297 N. L. R. B. 746, 748 (1990), enf'd, 928 F. 2d 695 (CA5 1991); *Food Employers Council, Inc.*, 293 N. L. R. B. 333, 334, 345–346 (1989); *Tile, Terazzo & Marble Contractors Assn.*, 287 N. L. R. B. 769, 772 (1987), enf'd, 935 F. 2d 1249 (CA11 1991), cert. denied, 502 U. S. 1031 (1992); *Salinas Valley Ford Sales, Inc.*, 279 N. L. R. B. 679, 686, 690 (1986); *Carlsen Porsche Audi, Inc.*, 266 N. L. R. B. 141, 152–153 (1983); *Typographic Service Co.*, 238 N. L. R. B. 1565 (1978); *United Fire Proof Warehouse Co.* v. *NLRB*, 356 F. 2d 494, 498–499 (CA7 1966); *Cuyamaca Meats, Inc.* v. *Butchers'*

*and Food Employers' Pension Trust Fund*, 638 F. Supp. 885, 887 (SD Cal. 1986), aff'd, 827 F. 2d 491 (CA9 1987), cert. denied, 485 U. S. 1008 (1988). We proceed on that assumption.

Multiemployer bargaining itself is a well-established, important, pervasive method of collective bargaining, offering advantages to both management and labor. See Appendix, *infra*, p. 251 (multiemployer bargaining accounts for more than 40% of major collective-bargaining agreements, and is used in such industries as construction, transportation, retail trade, clothing manufacture, and real estate, as well as professional sports); *NLRB* v. *Truck Drivers*, 353 U. S. 87, 95 (1957) *(Buffalo Linen)* (Congress saw multiemployer bargaining as "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining"); *Charles D. Bonanno Linen Service, Inc.* v. *NLRB*, 454 U. S. 404, 409, n. 3 (1982) *(Bonanno Linen)* (multiemployer bargaining benefits both management and labor, by saving bargaining resources, by encouraging development of industry-wide worker benefits programs that smaller employers could not otherwise afford, and by inhibiting employer competition at the workers' expense); Brief for Respondent NLRB in *Bonanno Linen*, O. T. 1981, No. 80–931, p. 10, n. 7 (same); General Subcommittee on Labor, House Committee on Education and Labor, Multiemployer Association Bargaining and its Impact on the Collective Bargaining Process, 88th Cong., 2d Sess., 10–19, 32–33 (Comm. Print 1964) (same); see also C. Bonnett, Employers' Associations in the United States: A Study of Typical Associations (1922) (history). The upshot is that the practice at issue here plays a significant role in a collective-bargaining process that itself constitutes an important part of the Nation's industrial relations system.

In these circumstances, to subject the practice to antitrust law is to require antitrust courts to answer a host of important practical questions about how collective bargaining over

wages, hours, and working conditions is to proceed—the very result that the implicit labor exemption seeks to avoid. And it is to place in jeopardy some of the potentially beneficial labor-related effects that multiemployer bargaining can achieve. That is because unlike labor law, which sometimes welcomes anticompetitive agreements conducive to industrial harmony, antitrust law forbids all agreements among competitors (such as competing employers) that unreasonably lessen competition among or between them in virtually any respect whatsoever. See, *e. g.*, *Paramount Famous Lasky Corp.* v. *United States*, 282 U. S. 30 (1930) (agreement to insert arbitration provisions in motion picture licensing contracts). Antitrust law also sometimes permits judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable, see, *e. g.*, *United States* v. *General Motors Corp.*, 384 U. S. 127, 142–143 (1966); *United States* v. *Foley*, 598 F. 2d 1323, 1331–1332 (CA4 1979), cert. denied, 444 U. S. 1043 (1980), or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision, see, *e. g.*, *American Tobacco Co.* v. *United States*, 328 U. S. 781, 809–810 (1946); *United States* v. *Masonite Corp.*, 316 U. S. 265, 275 (1942); *Interstate Circuit, Inc.* v. *United States*, 306 U. S. 208, 226–227 (1939). See generally 6 P. Areeda, Antitrust Law ¶¶ 1416–1427 (1986); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655 (1962).

If the antitrust laws apply, what are employers to do once impasse is reached? If all impose terms similar to their last joint offer, they invite an antitrust action premised upon identical behavior (along with prior or accompanying conversations) as tending to show a common understanding or agreement. If any, or all, of them individually impose terms that differ significantly from that offer, they invite an unfair

242

labor practice charge. Indeed, how can employers safely discuss their offers together even before a bargaining impasse occurs? A preimpasse discussion about, say, the practical advantages or disadvantages of a particular proposal invites a later antitrust claim that they agreed to limit the kinds of action each would later take should an impasse occur. The same is true of postimpasse discussions aimed at renewed negotiations with the union. Nor would adherence to the terms of an expired collective-bargaining agreement eliminate a potentially plausible antitrust claim charging that they had "conspired" or tacitly "agreed" to do so, particularly if maintaining the status quo were not in the immediate economic self-interest of some. Cf. *Interstate Circuit, supra,* at 222–223; 6 Areeda, *supra,* ¶ 1425. All this is to say that to permit antitrust liability here threatens to introduce instability and uncertainty into the collective-bargaining process, for antitrust law often forbids or discourages the kinds of joint discussions and behavior that the collective-bargaining process invites or requires.

We do not see any obvious answer to this problem. We recognize, as the Government suggests, that, in principle, antitrust courts might themselves try to evaluate particular kinds of employer understandings, finding them "reasonable" (hence lawful) where justified by collective-bargaining necessity. But any such evaluation means a web of detailed rules spun by many different nonexpert antitrust judges and juries, not a set of labor rules enforced by a single expert administrative body, namely the Board. The labor laws give the Board, not antitrust courts, primary responsibility for policing the collective-bargaining process. And one of their objectives was to take from antitrust courts the authority to determine, through application of the antitrust laws, what is socially or economically desirable collective-bargaining policy. See *supra,* at 236–237; see also *Jewel Tea,* 381 U. S., at 716–719 (opinion of Goldberg, J.).

### III

Both petitioners and their supporters advance several suggestions for drawing the exemption boundary line short of this case. We shall explain why we find them unsatisfactory.

### A

Petitioners claim that the implicit exemption applies only to labor-management *agreements*—a limitation that they deduce from case law language, see, *e. g., Connell,* 421 U. S., at 622 (exemption for "some union-employer *agreements*") (emphasis added), and from a proposed principle—that the exemption must rest upon labor-management consent. The language, however, reflects only the fact that the cases previously before the Court involved collective-bargaining agreements, see *id.,* at 619–620; *Pennington,* 381 U. S., at 660; *Jewel Tea, supra,* at 679–680; the language does not reflect the exemption's rationale, see 50 F. 3d, at 1050.

Nor do we see how an exemption limited by petitioners' principle of labor-management consent could work. One cannot mean the principle literally—that the exemption applies only to understandings embodied in a collective-bargaining agreement—for the collective-bargaining process may take place before the making of any agreement or after an agreement has expired. Yet a multiemployer bargaining process itself necessarily involves many procedural and substantive understandings among participating employers as well as with the union. Petitioners cannot rescue their principle by claiming that the exemption applies only insofar as *both* labor and management consent to those understandings. Often labor will not (and should not) consent to certain common bargaining positions that employers intend to maintain. Cf. Areeda & Hovenkamp, Antitrust Law ¶ 229'd, at 277 ("[J]oint employer preparation and bargaining in the context of a formal multi-employer bargaining unit is clearly exempt"). Similarly, labor need not consent to certain tactics that this Court has approved as part of the multiemployer

bargaining process, such as unit-wide lockouts and the use of temporary replacements. See *NLRB* v. *Brown*, 380 U. S. 278, 284 (1965); *Buffalo Linen*, 353 U. S., at 97.

Petitioners cannot save their consent principle by weakening it, as by requiring union consent only to the multiemployer bargaining process itself. This general consent is automatically present whenever multiemployer bargaining takes place. See *Hi-Way Billboards, Inc.*, 206 N. L. R. B. 22 (1973) (multiemployer unit "based on consent" and "established by an unequivocal agreement by the parties"), enf. denied on other grounds, 500 F. 2d 181 (CA5 1974); *Weyerhaeuser Co.*, 166 N. L. R. B. 299, 299–300 (1967). As so weakened, the principle cannot help decide *which* related practices are, or are not, subject to antitrust immunity.

## B

The Government argues that the exemption should terminate at the point of impasse. After impasse, it says, "employers no longer have a duty under the labor laws to maintain the status quo," and "are free as a matter of labor law to negotiate individual arrangements on an interim basis with the union." Brief for United States et al. as *Amici Curiae* 17.

Employers, however, are not completely free at impasse to act independently. The multiemployer bargaining unit ordinarily remains intact; individual employers cannot withdraw. *Bonanno Linen*, 454 U. S., at 410–413. The duty to bargain survives; employers must stand ready to resume collective bargaining. See, *e. g., Worldwide Detective Bureau*, 296 N. L. R. B. 148, 155 (1989); *Hi-Way Billboards, Inc., supra*, at 23. And individual employers can negotiate individual interim agreements with the union only insofar as those agreements are consistent with "the duty to abide by the results of group bargaining." *Bonanno Linen, supra*, at 416. Regardless, the absence of a legal "duty" to act jointly is not determinative. This Court has implied antitrust immunities

that extend beyond statutorily *required* joint action to joint action that a statute "expressly or impliedly allows or assumes must also be immune." 1 P. Areeda & D. Turner, Antitrust Law ¶ 224, p. 145 (1978); see, *e. g., Gordon* v. *New York Stock Exchange, Inc.*, 422 U. S. 659, 682–691 (1975) (immunizing application of joint rule that securities law permitted, but did not require); *United States* v. *National Assn. of Securities Dealers, Inc.*, 422 U. S. 694, 720–730 (1975) (same).

More importantly, the simple "impasse" line would not solve the basic problem we have described above. *Supra,* at 241–242. Labor law permits employers, after impasse, to engage in considerable joint behavior, including joint lockouts and replacement hiring. See, *e. g., Brown, supra,* at 289 (hiring of temporary replacement workers after lockout was "reasonably adapted to the achievement of a legitimate end—preserving the integrity of the multiemployer bargaining unit"). Indeed, as a general matter, labor law often limits employers to four options at impasse: (1) maintain the status quo, (2) implement their last offer, (3) lock out their workers (and either shut down or hire temporary replacements), or (4) negotiate separate interim agreements with the union. See generally 1 Hardin, The Developing Labor Law, at 516–520, 696–699. What is to happen if the parties cannot reach an interim agreement? The other alternatives are limited. Uniform employer conduct is likely. Uniformity—at least when accompanied by discussion of the matter—invites antitrust attack. And such attack would ask antitrust courts to decide the lawfulness of activities intimately related to the bargaining process.

The problem is aggravated by the fact that "impasse" is often temporary, see *Bonanno Linen, supra,* at 412 (approving Board's view of impasse as "a recurring feature in the bargaining process, . . . a temporary deadlock or hiatus in negotiations which in almost all cases is eventually broken, through either a change of mind or the application of economic force") (internal quotation marks omitted); W. Sim-

kin & N. Fidandis, Mediation and the Dynamics of Collective Bargaining 139–140 (2d ed. 1986); it may differ from bargaining only in degree, see 1 Hardin, *supra*, at 691–696; *Taft Broadcasting Co.*, 163 N. L. R. B., at 478; it may be manipulated by the parties for bargaining purposes, see *Bonanno Linen, supra*, at 413, n. 8 (parties might, for strategic purposes, "precipitate an impasse"); and it may occur several times during the course of a single labor dispute, since the bargaining process is not over when the first impasse is reached, cf. J. Bartlett, Familiar Quotations 754:8 (16th ed. 1992). How are employers to discuss future bargaining positions during a temporary impasse? Consider, too, the adverse consequences that flow from failing to guess how an *antitrust* court would later draw the impasse line. Employers who erroneously concluded that impasse had *not* been reached would risk antitrust liability were they collectively to maintain the status quo, while employers who erroneously concluded that impasse *had* occurred would risk unfair labor practice charges for prematurely suspending multiemployer negotiations.

The United States responds with suggestions for softening an "impasse" rule by extending the exemption after impasse "for such time as would be reasonable in the circumstances" for employers to consult with counsel, confirm that impasse has occurred, and adjust their business operations, Brief for United States et al. as *Amici Curiae* 24; by reestablishing the exemption once there is a "resumption of good-faith bargaining," *id.*, at 18, n. 5; and by looking to antitrust law's "rule of reason" to shield—"in some circumstances"—such joint actions as the unit-wide lockout or the concerted maintenance of previously established joint benefit or retirement plans, *ibid.* But even as so modified, the impasse-related rule creates an exemption that can evaporate in the middle of the bargaining process, leaving later antitrust courts free to second-guess the parties' bargaining decisions

and consequently forcing them to choose their collective-bargaining responses in light of what they predict or fear that antitrust courts, not labor law administrators, will eventually decide. Cf. *Dallas General Drivers, Warehousemen and Helpers, Local Union No. 745* v. *NLRB*, 355 F. 2d 842, 844–845 (CADC 1966) ("The problem of deciding when further bargaining . . . is futile is often difficult for the bargainers and is necessarily so for the Board. But in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal . . . or better suited to the expert experience of a board which deals constantly with such problems").

## C

Petitioners and their supporters argue in the alternative for a rule that would exempt postimpasse agreement about bargaining "tactics," but not postimpasse agreement about substantive "terms," from the reach of antitrust. See 50 F. 3d, at 1066–1069 (Wald, J., dissenting). They recognize, however, that both the Board and the courts have said that employers can, and often do, employ the imposition of "terms" as a bargaining "tactic." See, *e. g.*, *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 316 (1965); *Colorado-Ute Elec. Assn., Inc.* v. *NLRB*, 939 F. 2d 1392, 1404 (CA10 1991), cert. denied, 504 U. S. 955 (1992); *Circuit-Wise, Inc.*, 309 N. L. R. B. 905, 921 (1992); *Hi-Way Billboards*, 206 N. L. R. B., at 23; *Bonanno Linen*, 243 N. L. R. B., at 1094. This concession as to joint "tactical" implementation would turn the presence of an antitrust exemption upon a determination of the employers' primary purpose or motive. See, *e. g.*, 50 F. 3d, at 1069 (Wald, J., dissenting). But to ask antitrust courts, insulated from the bargaining process, to investigate an employer group's subjective motive is to ask them to conduct an inquiry often more amorphous than those we have previously discussed. And, in our view, a labor/antitrust line drawn on such a basis would too often raise

the same related (previously discussed) problems. See *supra*, at 237, 241–242; *Jewel Tea*, 381 U. S., at 716 (opinion of Goldberg, J.) (expressing concern about antitrust judges "roaming at large" through the bargaining process).

## D

Petitioners make several other arguments. They point, for example, to cases holding applicable, in collective-bargaining contexts, general "backdrop" statutes, such as a state statute requiring a plant-closing employer to make employee severance payments, *Fort Halifax Packing Co. v. Coyne*, 482 U. S. 1 (1987), and a state statute mandating certain minimum health benefits, *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U. S. 724 (1985). Those statutes, however, " 'neither encourage[d] nor discourage[d] the collective-bargaining processes that are the subject of the [federal labor laws].' " *Fort Halifax, supra*, at 21 (quoting *Metropolitan Life, supra*, at 755). Neither did those statutes come accompanied with antitrust's labor-related history. Cf. *Oliver*, 358 U. S., at 295–297 (state antitrust law interferes with collective bargaining and is not applicable to labor-management agreement).

Petitioners also say that irrespective of how the labor exemption applies elsewhere to multiemployer collective bargaining, professional sports is "special." We can understand how professional sports may be special in terms of, say, interest, excitement, or concern. But we do not understand how they are special in respect to labor law's antitrust exemption. We concede that the clubs that make up a professional sports league are not completely independent economic competitors, as they depend upon a degree of cooperation for economic survival. *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U. S. 85, 101–102 (1984); App. 110–115 (declaration of NFL Commissioner). In the present context, however, that circumstance

makes the league more like a single bargaining employer, which analogy seems irrelevant to the legal issue before us.

We also concede that football players often have special individual talents, and, unlike many unionized workers, they often negotiate their pay individually with their employers. See *post*, at 255 (STEVENS, J., dissenting). But this characteristic seems simply a feature, like so many others, that might give employees (or employers) more (or less) bargaining power, that might lead some (or all) of them to favor a particular kind of bargaining, or that might lead to certain demands at the bargaining table. We do not see how it could make a critical legal difference in determining the underlying framework in which bargaining is to take place. See generally Jacobs & Winter, Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L. J. 1 (1971). Indeed, it would be odd to fashion an antitrust exemption that gave additional advantages to professional football players (by virtue of their superior bargaining power) that transport workers, coal miners, or meat packers would not enjoy.

The dissent points to other "unique features" of the parties' collective-bargaining relationship, which, in the dissent's view, make the case "atypical." *Post*, at 255. It says, for example, that the employers imposed the restraint simply to enforce compliance with league-wide rules, and that the bargaining consisted of nothing more than the sending of a "notice," and therefore amounted only to "so-called" bargaining. *Post*, at 256–257. Insofar as these features underlie an argument for looking to the employers' true purpose, we have already discussed them. See *supra*, at 247–248. Insofar as they suggest that there was not a genuine impasse, they fight the basic assumption upon which the District Court, the Court of Appeals, petitioners, and this Court rest the case. See 782 F. Supp. 125, 134 (DC 1991); 50 F. 3d, at 1056–1057; Pet. for Cert. i. Ultimately, we cannot find a satisfactory basis for distinguishing football players from

other organized workers. We therefore conclude that all must abide by the same legal rules.

\* \* \*

For these reasons, we hold that the implicit ("nonstatutory") antitrust exemption applies to the employer conduct at issue here. That conduct took place during and immediately after a collective-bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship.

Our holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process. See, e. g., 50 F. 3d, at 1057 (suggesting that exemption lasts until collapse of the collective-bargaining relationship, as evidenced by decertification of the union); *El Cerrito Mill & Lumber Co.*, 316 N. L. R. B., at 1006–1007 (suggesting that "extremely long" impasse, accompanied by "instability" or "defunctness" of multiemployer unit, might justify union withdrawal from group bargaining). We need not decide in this case whether, or where, within these extreme outer boundaries to draw that line. Nor would it be appropriate for us to do so without the detailed views of the Board, to whose "specialized judgment" Congress "intended to leave" many of the "inevitable questions concerning multiemployer bargaining bound to arise in the future." *Buffalo Linen*, 353 U. S., at 96 (internal quotation marks omitted); see also *Jewel Tea*, 381 U. S., at 710, n. 18.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

### TABLE A

MAJOR BARGAINING UNITS AND EMPLOYMENT IN PRIVATE
INDUSTRY, BY TYPE OF BARGAINING UNIT, 1994.

(Covers bargaining units of 1,000 or more workers.)

| Type | Number Units | Number Employment | Percent Units | Percent Employment |
|------|------|------------|------|------------|
| I . . . . . . . . . . . . . . . . . | 522 | 2,305,478 | 44 | 43 |
| M&S . . . . . . . . . . . . . . | 664 | 3,040,159 | 56 | 57 |
| Total . . . . . . . . . . . . . . | 1,186 | 5,345,637 | 100 | 100 |

I = Multiemployer.
M = One company, more than one location.
S = One company, single location.
SOURCE: U. S. Dept. of Labor, Bureau of Labor Statistics, unpublished data (Feb. 14, 1996) (available in Clerk of Court's case file).

### TABLE B

MAJOR MULTIEMPLOYER COLLECTIVE BARGAINING UNITS AND
EMPLOYMENT IN PRIVATE INDUSTRY, BY INDUSTRY, 1994.

(Covers bargaining units of 1,000 or more workers.)

| Type | Number Units | Number Employment | Percent Units | Percent Employment |
|------|------|------------|------|------------|
| All industries . . . . . . . . | 522 | 2,305,478 | 100 | 100 |
| Manufacturing. . . . . . . . | 45 | 210,050 | 9 | 9 |
| Food. . . . . . . . . . . . . | 13 | 50,750 | 2 | 2 |
| Apparel. . . . . . . . . . | 23 | 141,600 | 4 | 6 |
| Other . . . . . . . . . . . | 9 | 17,700 | 2 | 1 |
| Nonmanufacturing. . . . . | 477 | 2,095,428 | 91 | 91 |
| Mining . . . . . . . . . . . | 2 | 267,500 | (1) | 3 |
| Construction . . . . . . . | 337 | 995,443 | 65 | 43 |
| Railroads. . . . . . . . . . | 12 | 189,183 | 2 | 8 |
| Other transportation. . | 20 | 156,662 | 4 | 7 |
| Wholesale trade . . . . . | 6 | 8,500 | 1 | (1) |
| Retail trade. . . . . . . . | 37 | 314,100 | 7 | 14 |
| Real estate . . . . . . . . | 11 | 85,800 | 2 | 4 |
| Hotels and motels. . . . | 11 | 79,200 | 2 | 3 |
| Business services . . . . | 13 | 63,200 | 2 | 3 |
| Health services . . . . . | 8 | 65,100 | 2 | 3 |
| Other . . . . . . . . . . . . | 20 | 70,740 | 4 | 3 |

(1) = More than 0 and less than 0.05 percent.
SOURCE: U. S. Dept. of Labor, Bureau of Labor Statistics, unpublished data (Apr. 17, 1996) (available in Clerk of Court's case file).

JUSTICE STEVENS, dissenting.

In his classic dissent in *Lochner* v. *New York*, 198 U. S. 45, 75 (1905), Justice Holmes reminded us that our disagreement with the economic theory embodied in legislation should not affect our judgment about its constitutionality. It is equally important, of course, to be faithful to the economic theory underlying broad statutory mandates when we are construing their impact on areas of the economy not specifically addressed by their texts. The unique features of this case lead me to conclude that the Court has reached a decision that conflicts with the basic purpose of both the antitrust laws and the national labor policy expressed in a series of congressional enactments.

## I

The basic premise underlying the Sherman Act is the assumption that free competition among business entities will produce the best price levels. *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 695 (1978). Collusion among competitors, it is believed, may produce prices that harm consumers. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 226, n. 59 (1940). Similarly, the Court has held, a marketwide agreement among employers setting wages at levels that would not prevail in a free market may violate the Sherman Act. *Anderson* v. *Shipowners Assn. of Pacific Coast*, 272 U. S. 359 (1926).

The jury's verdict in this case has determined that the marketwide agreement among these employers fixed the salaries of the replacement players at a dramatically lower level than would obtain in a free market. While the special characteristics of this industry may provide a justification for the agreement under the rule of reason, see *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 100–104 (1984), at this stage of the proceeding our analysis of the exemption issue must accept the premise that the agreement is unlawful unless it is exempt.

The basic premise underlying our national labor policy is that unregulated competition among employees and applicants for employment produces wage levels that are lower than they should be.[1] Whether or not the premise is true in fact, it is surely the basis for the statutes that encourage and protect the collective-bargaining process, including the express statutory exemptions from the antitrust laws that Congress enacted in order to protect union activities.[2] Those statutes were enacted to enable collective action by union members to achieve wage levels that are higher than would be available in a free market. See *Trainmen* v. *Chicago R. & I. R. Co.*, 353 U. S. 30, 40 (1957).

The statutory labor exemption protects the right of workers to act collectively to seek better wages, but does not

---

[1] "The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries." 29 U. S. C. § 151; R. Posner & F. Easterbrook, Antitrust 31 (2d ed. 1981) ("The main purpose of labor unions is to raise wages by suppressing competition among workers . . ."); see also *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676, 723 (1965) (opinion of Goldberg, J.) ("The very purpose and effect of a labor union is to limit the power of an employer to use competition among workingmen to drive down wage rates and enforce substandard conditions of employment").

[2] "The basic sources of organized labor's exemption from federal antitrust laws are §§ 6 and 20 of the Clayton Act, 38 Stat. 731 and 738, 15 U. S. C. § 17 and 29 U. S. C. § 52, and the Norris-LaGuardia Act, 47 Stat. 70, 71, and 73, 29 U. S. C. §§ 104, 105, and 113. These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws. See *United States* v. *Hutcheson*, 312 U. S. 219 (1941). They do not exempt concerted action or agreements between unions and nonlabor parties. *Mine Workers* v. *Pennington*, 381 U. S. 657, 662 (1965)." *Connell Constr. Co.* v. *Plumbers*, 421 U. S. 616, 621–622 (1975).

"exempt concerted action or agreements between unions and nonlabor parties." *Connell Constr. Co.* v. *Plumbers,* 421 U. S. 616, 621–622 (1975). It is the judicially crafted, nonstatutory labor exemption that serves to accommodate the conflicting policies of the antitrust and labor statutes in the context of action between employers and unions. *Ibid.*

The limited judicial exemption complements its statutory counterpart by ensuring that unions which engage in collective bargaining to enhance employees' wages may enjoy the benefits of the resulting agreements. The purpose of the labor laws would be frustrated if it were illegal for employers to enter into industrywide agreements providing supracompetitive wages for employees. For that reason, we have explained that "a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." *Id.,* at 622.

Consistent with basic labor law policies, I agree with the Court that the judicially crafted labor exemption must also cover some collective action that employers take in response to a collective-bargaining agent's demands for higher wages. Immunizing such action from antitrust scrutiny may facilitate collective bargaining over labor demands. So, too, may immunizing concerted employer action designed to maintain the integrity of the multiemployer bargaining unit, such as lockouts that are imposed in response to "a union strike tactic which threatens the destruction of the employers' interest in bargaining on a group basis." *NLRB* v. *Truck Drivers,* 353 U. S. 87, 93 (1957).

In my view, however, neither the policies underlying the two separate statutory schemes, nor the narrower focus on the purpose of the nonstatutory exemption, provides a justification for exempting from antitrust scrutiny collective action initiated by employers to depress wages below the level

that would be produced in a free market. Nor do those policies support a rule that would allow employers to suppress wages by implementing noncompetitive agreements among themselves on matters that have not previously been the subject of either an agreement with labor or even a demand by labor for inclusion in the bargaining process. That, however, is what is at stake in this litigation.

## II

In light of the accommodation that has been struck between antitrust and labor law policy, it would be most ironic to extend an exemption crafted to protect collective action by employees to protect employers acting jointly to deny employees the opportunity to negotiate their salaries individually in a competitive market. Perhaps aware of the irony, the Court chooses to analyze this case as though it represented a typical impasse in an unexceptional multiemployer bargaining process. In so doing, it glosses over three unique features of the case that are critical to the inquiry into whether the policies of the labor laws require extension of the nonstatutory labor exemption to this atypical case.

First, in this market, unlike any other area of labor law implicated in the cases cited by the Court, player salaries are individually negotiated. The practice of individually negotiating player salaries prevailed even prior to collective bargaining.[3] The players did not challenge the prevailing

[3] As the District Court explained: "The present case does not involve any change in preexisting wage terms of either an active or expired collective bargaining agreement. In fact, creation of the developmental squads added a novel category of players to each NFL club. These players were not treated under the salary terms applicable to regular NFL players. Under the 1982 Collective Bargaining Agreement, the NFL players were expressly given the right to negotiate the salary terms of their contracts. 1982 Collective Bargaining Agreement at Article XXII, Plaintiffs' Exhibits at 1. By contrast, the developmental squad contracts indicates that the prospective developmental squad players had no right to negotiate their own salary terms but instead were to receive a fixed non-negotiable

practice because, unlike employees in most industries, they want their compensation to be determined by the forces of the free market rather than by the process of collective bargaining. Thus, although the majority professes an inability to understand anything special about professional sports that should affect the framework of labor negotiations, *ante*, at 248–249, in this business it is the employers, not the employees, who seek to impose a noncompetitive uniform wage on a segment of the market and to put an end to competitive wage negotiations.

Second, respondents concede that the employers imposed the wage restraint to force owners to comply with league-wide rules that limit the number of players that may serve on a team, not to facilitate a stalled bargaining process, or to revisit any issue previously subjected to bargaining. Brief for Respondents 4. The employers could have confronted the culprits directly by stepping up enforcement of roster limits. They instead chose to address the problem by unilaterally preventing players from individually competing in the labor market.

Third, although the majority asserts that the "club owners had bargained with the players' union over a wage issue until they reached impasse," *ante*, at 234, that hardly constitutes a complete description of what transpired. When the employers' representative advised the union that they proposed to pay the players a uniform wage determined by the owners, the union promptly and unequivocally responded that their proposal was inconsistent with the "principle" of individual salary negotiation that had been accepted in the past and that predated collective bargaining.[4] The so-called "bar-

---

salary of $1,000 per week. Plaintiffs' Exhibits at 8, 9, 15 & 28." 782 F. Supp. 125, 138 (DC 1991).

[4] In a memorandum summarizing his meeting with the union representative, the owners representative stated, in part:

"Gene [Upshaw] indicated he fully understood the developmental squad but could not agree to any arrangement that eliminated the right of any

gaining" that followed amounted to nothing more than the employers' notice to the union that they had decided to implement a decision to replace individual salary negotiations with a uniform wage level for a specific group of players.[5]

Given these features of the case, I do not see why the employers should be entitled to a judicially crafted exemption from antitrust liability. We have explained that "[t]he nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions." *Connell Constr. Co.*, 421 U. S., at 622. I know of no similarly strong labor policy that favors the association of employers to eliminate a competitive method of negotiating wages that predates collective bargaining and that labor would prefer to preserve.

Even if some collective action by employers may justify an exemption because it is necessary to maintain the "integrity of the multiemployer bargaining unit," *NLRB* v. *Brown*, 380 U. S. 278, 289 (1965), no such justification exists here. The employers imposed a fixed wage even though there was no dispute over the pre-existing principle that player salaries should be individually negotiated. They sought only to prevent certain owners from evading roster limits and thereby gaining an unfair advantage. Because "the employer's interest is a competitive interest rather than an interest in regulating its own labor relations," *Mine Workers* v. *Pennington*, 381 U. S. 657, 667 (1965), there would seem to be no

---

player to negotiate his individual salary. Upshaw said that no matter what salary level we proposed to pay developmental players, whether it was our $1,000 weekly or a higher number, the union would not 'in principle' permit two classes of players to exist, one with individual bargaining rights and one without." App. 19–20.

[5] The unique features of this case presumably explain why the National Labor Relations Board (Labor Board) can endorse the position of the players in this case without fearing the adverse impact on the bargaining process in the hypothetical cases that concern the Court. Brief for United States et al. as *Amici Curiae* 27, n. 10.

more reason to exempt this concerted, anticompetitive employer action from the antitrust laws than the action held unlawful in *Radovich* v. *National Football League*, 352 U. S. 445 (1957).

The point of identifying the unique features of this case is not, as the Court suggests, to make the case that professional football players, alone among workers, should be entitled to enforce the antitrust laws against anticompetitive collective employer action. *Ante*, at 249. Other employees, no less than well-paid athletes, are entitled to the protections of the antitrust laws when their employers unite to undertake anticompetitive action that causes them direct harm and alters the state of employer-employee relations that existed prior to unionization. Here that alteration occurred because the wage terms that the employers unilaterally imposed directly conflict with a pre-existing principle of agreement between the bargaining parties. In other contexts, the alteration may take other similarly anticompetitive and unjustifiable forms.

## III

Although exemptions should be construed narrowly, and judicially crafted exemptions more narrowly still, the Court provides a sweeping justification for the exemption that it creates today. The consequence is a newly minted exemption that, as I shall explain, the Court crafts only by ignoring the reasoning of one of our prior decisions in favor of the views of the dissenting Justice in that case. Of course, the Court actually holds only that this new exemption applies in cases such as the present in which the parties to the bargaining process are affected by the challenged anticompetitive conduct. *Ante*, at 250. But that welcome limitation on its opinion fails to make the Court's explanation of its result in this case any more persuasive.

The Court explains that the nonstatutory labor exemption serves to ensure that "antitrust courts" will not end up substituting their views of labor policy for those of either the

Labor Board or the bargaining parties. *Ante,* at 236–237. The Court concludes, therefore, that almost any concerted action by employers that touches on a mandatory subject of collective bargaining, no matter how obviously offensive to the policies underlying the Nation's antitrust statutes, should be immune from scrutiny so long as a collective-bargaining process is in place. It notes that a contrary conclusion would require "antitrust courts, insulated from the bargaining process, to investigate an employer group's subjective motive," a task that it believes too "amorphous" to be permissible. *Ante,* at 247.

The argument that "antitrust courts" should be kept out of the collective-bargaining process has a venerable lineage. See *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 483–488 (1921) (Brandeis, J., joined by Holmes and Clarke, JJ., dissenting). Our prior precedents subscribing to its basic point, however, do not justify the conclusion that employees have no recourse other than the Labor Board when employers collectively undertake anticompetitive action. In fact, they contradict it.

We have previously considered the scope of the nonstatutory labor exemption only in cases involving challenges to anticompetitive *agreements* between unions and employers brought by other employers not parties to those agreements. *Ante,* at 243. Even then, we have concluded that the exemption does not always apply. See *Mine Workers* v. *Pennington,* 381 U. S., at 663.

As *Pennington* explained, the mere fact that an antitrust challenge touches on an issue, such as wages, that is subject to mandatory bargaining does not suffice to trigger the judicially fashioned exemption. *Id.,* at 664. Moreover, we concluded that the exemption should not obtain in *Pennington* itself only after we examined the motives of one of the parties to the bargaining process. *Id.,* at 667.

The Court's only attempt to square its decision with *Pennington* occurs at the close of its opinion. It concludes that

the exemption applies because the employers' action "grew out of, and was directly related to, the lawful operation of the bargaining process," "[i]t involved a matter that the parties were required to negotiate collectively," and that "concerned only the parties to the collective-bargaining relationship." *Ante*, at 250.

As to the first two qualifiers, the same could be said of *Pennington*. Indeed, the same was said *and rejected* in *Pennington*. "This is not to say that an agreement resulting from union-employer negotiations is automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining, regardless of the subject or the form and content of the agreement." 381 U. S., at 664–665.

The final qualifier does distinguish *Pennington*, but only partially so. To determine whether the exemption applied in *Pennington*, we undertook a detailed examination into whether the policies of labor law so strongly supported the agreement struck by the bargaining parties that it should be immune from antitrust scrutiny. We concluded that because the agreement affected employers not parties to the bargaining process, labor law policies could not be understood to require the exemption.

Here, however, the Court does not undertake a review of labor law policy to determine whether it would support an exemption for the unilateral imposition of anticompetitive wage terms by employers on a union. The Court appears to conclude instead that the exemption should apply merely because the employers' action was implemented during a lawful negotiating process concerning a mandatory subject of bargaining. Thus, the Court's analysis would seem to constitute both an unprecedented expansion of a heretofore limited exemption, and an unexplained repudiation of the reasoning in a prior, nonconstitutional decision that Congress itself has not seen fit to override.

The Court nevertheless contends that the "rationale" of our prior cases supports its approach. *Ante,* at 243. As support for that contention, it relies heavily on the views espoused in Justice Goldberg's separate opinion in *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676 (1965). At five critical junctures in its opinion, see *ante,* at 236, 237–238, 242, 247–248, the Court invokes that separate concurrence to explain why, for purposes of applying the nonstatutory labor exemption, labor law policy admits of no distinction between collective employer action taken in response to labor demands and collective employer action of the kind we consider here.

It should be remembered that *Jewel Tea* concerned only the question whether an *agreement* between employers and a union may be exempt, and that even then the Court did not accept the broad antitrust exemption that Justice Goldberg advocated. Instead, Justice White, the author of *Pennington,* writing for Chief Justice Warren and Justice Brennan, explained that even in disputes over the lawfulness of agreements about terms that are subject to mandatory bargaining, courts must examine the bargaining process to determine whether antitrust scrutiny should obtain. *Jewel Tea,* 381 U. S., at 688–697. "The crucial determinant is not the form of the agreement—*e. g.,* prices or wages—but its relative impact on the product market *and the interests of union members." Id.,* at 690, n. 5 (emphasis added). Moreover, the three dissenters, Justices Douglas, Clark, and Black, concluded that the union was entitled to no immunity at all. *Id.,* at 735–738.

It should also be remembered that Justice Goldberg used his separate opinion in *Jewel Tea* to explain his reasons for *dissenting* from the Court's opinion in *Pennington.* He explained that the Court's approach in *Pennington* was unjustifiable precisely because it permitted "antitrust courts" to reexamine the bargaining process. The Court fails to explain its apparent substitution in this case of Justice Gold-

berg's understanding of the exemption, an understanding previously endorsed by only two other Justices, for the one adopted by the Court in *Pennington*.

The Court's silence is all the more remarkable in light of the patent factual distinctions between *Jewel Tea* and the present case. It is not at all clear that Justice Goldberg himself understood his expansive rationale to require application of the exemption in circumstances such as those before us here. Indeed, the main theme of his opinion was that the antitrust laws should not be used to circumscribe bargaining over union demands. *Jewel Tea*, 381 U. S., at 723–725. Moreover, Justice Goldberg proved himself to be a most unreliable advocate for the sweeping position that the Court attributes to him.

Not long after leaving the Court, Justice Goldberg served as counsel for Curt Flood, a professional baseball player who contended that major league baseball's reserve clause violated the antitrust laws. *Flood* v. *Kuhn*, 407 U. S. 258 (1972). Although the *Flood* case primarily concerned whether professional baseball should be exempt from antitrust law altogether, see *Federal Baseball Club of Baltimore, Inc.* v. *National League of Professional Baseball Clubs*, 259 U. S. 200 (1922); *Toolson* v. *New York Yankees, Inc.*, 346 U. S. 356 (1953), the labor law dimensions of the case did not go unnoticed.

The article that first advanced the expansive view of the nonstatutory labor exemption that the Court appears now to endorse was written shortly after this Court granted certiorari in *Flood*, see Jacobs & Winter, Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L. J. 1 (1971), and the parties to the case addressed the very questions now before us. Aware of both this commentary, and, of course, his own prior opinion in *Jewel Tea*, Justice Goldberg explained in his brief to this Court why baseball's reserve clause should not be protected from antitrust review by the nonstatutory labor exemption.

"This Court has held that *even* a labor organization, the principal intended beneficiary of the so-called labor exemption, may not escape antitrust liability when it acts, not unilaterally and in the sole interest of its own members, but in concert with employers 'to prescribe labor standards outside the bargaining unit[.]' And this is so even when the issue is so central to bargaining as wages. *Mine Workers* v. *Pennington*, 381 U. S. at 668. Compare *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676 (1965). See *Ramsey* v. *Mine Workers*, 401 U. S. 302, 307 (1971). . . .

"The separate opinion on which respondents focus did express the view that 'collective bargaining activity on mandatory subjects of bargaining' is exempt from antitrust regulation, without regard to whether the union conduct involved is 'unilateral.' *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. at 732 (concurring opinion). But the author of that opinion agreed with the majority that agreements between unions and nonlabor groups on hard-core restraints like 'price-fixing and market allocation' were not exempt. 381 U. S. at 733. And there is no support in any of the opinions filed in *Meat Cutters* for Baseball's essential, if tacit, contention that unilateral, hard-core anticompetitive activity by employers acting alone—the present case—is somehow exempt from antitrust regulation." Reply Brief for Petitioner in *Flood* v. *Kuhn*, O. T. 1971, No. 71–32, pp. 13–14.

Moreover, Justice Goldberg explained that the extension of antitrust immunity to unilateral, anticompetitive employer action would be particularly inappropriate because baseball's reserve clause predated collective bargaining.

"This case is in fact much clearer than *Pennington, Meat Cutters,* or *Ramsey,* for petitioner does not challenge the fruits of collective bargaining activity. He seeks relief from a scheme—the reserve system—which

Baseball admits has been in existence for nearly a century, and which the trial court expressly found was 'created and imposed by the club owners long before the arrival of collective bargaining.'" *Id.,* at 14.

I would add only that this case is in fact much clearer than *Flood,* for there the owners sought only to *preserve* a restraint on competition to which the union had not agreed, while here they seek to *create* one.

Adoption of Justice Goldberg's views would mean, of course, that in some instances "antitrust courts" would have to displace the authority of the Labor Board. The labor laws do not exist, however, to ensure the perpetuation of the Board's authority. That is why we have not previously adopted the Court's position. That is also why in other contexts we have not thought the mere existence of a collective-bargaining agreement sufficient to immunize employers from background laws that are similar to the Sherman Act. See *Fort Halifax Packing Co.* v. *Coyne,* 482 U. S. 1 (1987); *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724 (1985).[6]

---

[6] In *Teamsters* v. *Oliver,* 358 U. S. 283 (1959), we held that a state antitrust law could not be used to challenge an employer-union agreement. Justice White's opinion in *Jewel Tea* explains, however, that *Oliver* held only that "[a]s the agreement did not embody a '"remote and indirect approach to the subject of wages" . . . but a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract,' [358 U. S.], at 294, the paramount federal policy of encouraging collective bargaining proscribed application of the state law." *Jewel Tea Co.,* 381 U. S., at 690, n. 5.

Moreover, in the petition for certiorari in *Flood,* Justice Goldberg explained that *Oliver* was not controlling.

"Petitioner has not addressed the contention advanced by respondents at trial but not reached by the courts below, that the reserve system is a matter for collective bargaining and hence exempt from state and federal antitrust laws under *Teamsters Union* v. *Oliver,* 358 U. S. 283 (1959), and *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676 (1965). Neither of these decisions holds that an *employer* conspiracy to restrain trade is exempted from antitrust regulation where an employee group has been implicated in the scheme. No Justice participating in *Meat Cutters* dissented from the

## IV

Congress is free to act to exempt the anticompetitive employer conduct that we review today. In the absence of such action, I do not believe it is for us to stretch the limited exemption that we have fashioned to facilitate the express statutory exemption created for labor's benefit so that unions must strike in order to restore a prior practice of individually negotiating salaries. I therefore agree with the position that the District Court adopted below.

"Because the developmental squad salary provisions were a new concept and not a change in terms of the expired collective bargaining agreement, the policy behind continuing the nonstatutory labor exemption for the terms of a collective bargaining agreement after expiration (to foster an atmosphere conducive to the negotiation of a new collective bargaining agreement) does not apply. To hold that the nonstatutory labor exemption extends to shield the NFL from antitrust liability for imposing restraints never before agreed to by the union would not only infringe on the union's freedom to contract, *H. K. Porter Co.* v. *NLRB*, 397 U. S. at 108 . . . (one of fundamental policies of NLRA is freedom of contract), but would also contradict the very purpose of the antitrust exemption by not promoting execution of a collective bargaining agreement with terms mutu-

proposition that hard core 'anticompetitive commercial restraint[s]' like 'price-fixing and market allocation'—and petitioner would add group boycotts—were subject to antitrust regulation even where bargained about. 381 U. S. 732–33 (concurring opinion). As this Court unanimously warned in 1949, 'Benefits to organized labor cannot be utilized as a cat's paw to pull employer's chestnuts out of antitrust fires.' *United States* v. *Women's Sportswear Mfr's Ass'n*, 336 U. S. 460, 464 (1949). See also *Allen Bradley Co.* v. *Local No. 3*, 325 U. S. [797] (1945). Similar arguments by football were rejected by this Court in *Radovich* [v. *National Football League*, 352 U. S. 445 (1957),] as 'without merit,' and the reserve systems of other sports are now regulated by state and federal antitrust laws." Pet. for Cert. in *Flood* v. *Kuhn*, O. T. 1971, No. 71–32, p. 21, n. 9.

266

ally acceptable to employer and labor union alike. Labor unions would be unlikely to sign collective bargaining agreements with employers if they believed that they would be forced to accept terms to which they never agreed." 782 F. Supp. 125, 139 (DC 1991) (footnote omitted).

Accordingly, I respectfully dissent.