90 F.3d 238
 152 L.R.R.M. (BNA) 2967, 1996-2 Trade Cases P 71,494
 EHREDT UNDERGROUND, INC., Plaintiff-Appellant,
v.
COMMONWEALTH EDISON COMPANY, International Brotherhood of
Electrical Workers, AFL-CIO, and Local No. 196 of
that International Union, Defendants-Appellees.
 No. 95-3244.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 3, 1996.
Decided July 23, 1996.
 
 Gerard C. Smetana, Chicago, IL, Thomas M. Triplett (argued), Schwabe, Williamson & Wyatt, Portland, OR, David G. Duggan, Chicago, IL, and Thomas J. Greenan, Schwabe, Williamson, Ferguson & Burdell, Seattle, WA, for plaintiff-appellant.
 Brian J. Gold, and Gerald A. Ambrose (argued), Sidley & Austin, Chicago, IL, for Commonwealth Edison Company.
 Robert E. Fitzgerald, Jr. (argued), Chicago, IL, for International Brotherhood of Electrical Workers, AFL-CIO and its Local Union No. 196.
 Before BAUER, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 Until 1988 Commonwealth Edison Company dug all of its own trenches for electrical cables. To avoid labor trouble when it began subcontracting some of this work, Commonwealth Edison insisted that the contractors employ union members. Ehredt Underground, until then a non-union contractor, signed a collective bargaining agreement with Local 336 of the International Brotherhood of Electrical Workers (IBEW) in order to become eligible. Late in 1988 Ehredt bid against Trench-It, Inc., for work near Chicago. Ehredt's bid prevailed, because its labor costs were lower.
 
 
 2
 Trench-It set about to raise its rival's costs. In 1990 Trench-It persuaded the IBEW to rule that all cable laying near Chicago is in the jurisdiction of Local 196, which already represented Trench-It's employees and had made most-favored-nation promises. That is to say, Local 196 had promised employers that they would receive the benefits of any more favorable terms granted to other firms, a commitment that dissuaded Local 196 from making concessions. Local 336 informed Ehredt that their relations would end on October 31, 1990. Ehredt had to sign with another union if it wanted to keep Commonwealth Edison's business. Trench-It prevailed on Commonwealth Edison to insist that its trenching subcontractors use IBEW labor. We may assume that the employees who made this decision did not promote the interests of Commonwealth Edison's investors; Ehredt contends that money changed hands. (For current purposes we accept this assertion, though it has not been proved.) On November 19, 1990, the National Labor Relations Board conducted an election among Ehredt's employees. The two contestants were the Congress of Independent Unions (CIU) and Local 196 of the IBEW. Ehredt told its employees that Commonwealth Edison would not use any firm whose employees were represented by the CIU; the employees voted for the IBEW, the Board certified the results, and Ehredt signed Local 196's area-wide collective bargaining agreement. Faced with higher labor costs, Ehredt sought concessions from Commonwealth Edison on work already under contract--work that was profitable with Local 336's hourly wages but unprofitable with Local 196's. Commonwealth Edison held Ehredt to the terms of the contract, which Ehredt then refused to perform. After Ehredt walked off the job on January 14, 1991, Commonwealth Edison gave the work to Trench-It. Ehredt has never worked for Commonwealth Edison again.
 
 
 3
 This suit under § 1 of the Sherman Act, 15 U.S.C. § 1, contends that Commonwealth Edison, Trench-It, the IBEW, and Local 196 entered into a conspiracy to restrain trade that is unlawful per se. Judge Alesia concluded that a per se approach is untenable. He dismissed some state-law theories but set the case for trial on Ehredt's fallback argument that Commonwealth Edison violated the antitrust laws under a Rule of Reason approach. The case was transferred for trial to Chief Judge Posner, sitting by designation. He took the case off the calendar and granted summary judgment for defendants, ruling that Ehredt could not show that Commonwealth Edison possessed power to raise prices in the market for trench digging in northern Illinois, given the ease of new entry and the ease with which existing firms may expand their output. Market power is an essential element of any antitrust case under the Rule of Reason, see Digital Equipment Corp. v. Uniq Digital Technologies, Inc., 73 F.3d 756, 761 (7th Cir.1996) (collecting authority), so inability to establish it ended the case.
 
 
 4
 Ehredt's appeal poses the question how a buyer of goods or services could be liable under the antitrust laws for paying more than the lowest achievable price. If General Motors decides to buy tires from Goodrich for more than Goodyear bids, this might injure both GM and Goodyear, but it would not injure the process of competition. See Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227 (1st Cir.1983) (Breyer, J.); Stamatakis Industries, Inc. v. King, 965 F.2d 469, 471-72 (7th Cir.1992). GM must bear the higher price. A manufacturer is consumers' champion when it comes to buying inputs such as tires, or trenches--and even a utility can't always recover higher costs it incurs needlessly. Kansas v. Utilicorp United, Inc., 497 U.S. 199, 210-12, 110 S.Ct. 2807, 2813-15, 111 L.Ed.2d 169 (1990). Over and over, we stress that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business. E.g., Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc., 61 F.3d 1250, 1256-57 (7th Cir.1995); Sanjuan v. American Board of Psychiatry & Neurology, Inc., 40 F.3d 247, 251-52 (7th Cir.1994); Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1413-14 (7th Cir.1989). To put this differently, it is hard to see how Ehredt suffered antitrust injury. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). It did not pay higher prices as a consumer, and it did not suffer from a monopsony. Although it alleges unlawful exclusion from a market, what "market" could that be, given that it remained free to sell to other buyers of trenching services, the clientele it had before Commonwealth Edison started subcontracting in 1988? It would not make sense to speak of "the market in trenches dug for Commonwealth Edison."
 
 
 5
 We think, however, that it is unnecessary to work out the antitrust implications of Commonwealth Edison's decisions, because they have none. To show why, we take up labor law, and will work back to antitrust. A buyer of construction services may insist that its contractors have labor agreements with an identified union, to reduce the potential for labor unrest. Indeed, the project's owner or general contractor may insist that subcontractors accede to a particular collective bargaining agreement that provides for wages higher than the subcontractor otherwise would pay. See 29 U.S.C. § 158(e), (f); Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc., 507 U.S. 218, 230-32, 113 S.Ct. 1190, 1197-99, 122 L.Ed.2d 565 (1993) (Boston Harbor). Ehredt accordingly does not argue that Commonwealth Edison violated the National Labor Relations Act by doing business only with trenching subcontractors whose employees were represented by the IBEW. Nor could Ehredt claim successfully in this case that the IBEW's resolution of the jurisdictional dispute between Local 196 and Local 336 violated the NLRA, or that a most-favored-nation clause in a collective bargaining agreement is unlawful; these subjects are in the province of the NLRB. Finally, the election of Local 196 to represent Ehredt's workers was supervised by the NLRB, and Ehredt did not ask the Board to set aside the results; instead Ehredt promptly signed a collective bargaining agreement with that union. From this everything else followed--for it was the more costly agreement with Local 196 that led to Ehredt's woes.
 
 
 6
 Judge Alesia properly held that Ehredt's state-law claims against the unions are preempted. For example, Ehredt wants damages from Local 196 and the IBEW on the ground that they interfered with its contract with Commonwealth Edison--not only by assigning the work to Local 196 but also, Ehredt insists, by falsely representing, as an inducement to sign Local 196's area-wide collective bargaining agreement, that Commonwealth Edison would amend its contract to protect Ehredt's profits. These activities are in the domain of federal labor law, and state regulation is forbidden whether federal law arguably protects or arguably prohibits the conduct. E.g., San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Costly collective bargaining agreements make many a contract unprofitable, and high wages have driven many an employer out of business. If this permitted the award of damages against unions under state law, the federal regulatory system would come unraveled. For the same reasons, the federal antitrust laws do not apply. Ehredt wants to use the Sherman Act in much the same way as it wants to use state tort law--as a source of compensation from employers and unions whose labor-law maneuvers have turned its books from black to red. That is not a function of the antitrust laws.
 
 
 7
 Brown v. Pro Football, Inc., --- U.S. ----, ----, 116 S.Ct. 2116, 2120, 135 L.Ed.2d 521 (1996), explains that an "implicit ('nonstatutory') exemption [to the antitrust laws] interprets the labor statutes ... as limiting an antitrust court's authority to determine, in the area of industrial conflict, what is or is not a 'reasonable' practice. It thereby substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations as to the appropriate legal limits of industrial conflict." At oral argument, counsel for Ehredt argued that the nonstatutory labor exemption is inapplicable because multiple employers collaborated to Ehredt's disadvantage. But we need not consider how Brown would apply to a conspiracy among unaffiliated employers, for Trench-It was a seller to, rather than a rival of, Commonwealth Edison. Brown held that an agreement among football clubs (an established multi-employer bargaining unit) to pay a particular salary to developmental squad players is outside the scope of the antitrust laws. The Court observed that multi-employer bargaining is common and lawful. So, too, it is lawful for an owner or general contractor to establish conditions for the conduct of work, even if that involves coordination with other firms. Boston Harbor shows that the labor laws permit an owner to insist that multiple contractors adhere to a single representational system and wage rate for a construction project. The Court concluded in Brown that a general multiple-employer exception to the nonstatutory labor exemption would "require antitrust courts to answer a host of important practical questions about how collective bargaining over wages, hours, and working conditions is to proceed--the very result that the implicit labor exemption seeks to avoid." --- U.S. at ----, 116 S.Ct. at 2122.
 
 
 8
 In order to adjudicate Ehredt's claim, we would have to do exactly what Brown says a court should not: scrutinize the labor relations of a firm and determine which steps were unreasonable. The final paragraph of Brown suggests that antitrust laws might be applicable if a labor-management impasse lasts so long that the collective bargaining process is essentially defunct, but that is hardly a description of our case, where the injury stemmed directly from a collective bargaining agreement. Moreover, Commonwealth Edison has not used unions to cartelize the electricity market; its market power vis-a-vis consumers is unaffected by the terms on which it hires trench diggers. Contrast Connell Construction Co. v. Plumbers & Steamfitters Union, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).
 
 
 9
 Ehredt could have protested to the National Labor Relations Board. Whether it had good grounds for complaint is a subject we need not consider. We are confident, however, that Ehredt's antitrust claim is a non-starter. Judge Posner properly dismissed, without prejudice, the state-law claims that are not preempted, 28 U.S.C. § 1367(c)(3), so the judgment is
 
 
 10
 AFFIRMED.