In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-3555

CHICAGO DISTRICT COUNCIL OF
CARPENTERS PENSION FUND, ET AL.,

*Plaintiffs,*

*v.*

REINKE INSULATION COMPANY
and K. REINKE, JR. & COMPANY,

*Defendants-Appellants,*

*v.*

CHICAGO AND NORTHEAST ILLINOIS
DISTRICT COUNCIL OF CARPENTERS and
UNITED BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, LOCAL 1307,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 8102—**Wayne R. Andersen**, *Judge.*

ARGUED FEBRUARY 17, 2006—DECIDED SEPTEMBER 18, 2006

Before FLAUM, *Chief Judge,* and KANNE, and WOOD,
*Circuit Judges.*

KANNE, *Circuit Judge.* Reinke Insulation Co. and K.
Reinke, Jr. & Co. (which we will treat, for purposes of this

opinion, as one entity called "Reinke") have been in a longstanding dispute with a local Union ("Union") and the Chicago District Council of Carpenters Pension Fund ("Fund"). This litigation had its inception when the Fund sued Reinke alleging a deficiency in pension and welfare contributions Reinke was required to make according to a collective bargaining agreement. Reinke responded by leveling counterclaims against the Union.

The initial suit by the Fund was resolved in favor of Reinke and affirmed by this court in *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262 (7th Cir. 2003) *("Reinke I")*. Judge Andersen granted the Union summary judgment on all of Reinke's counterclaims. This appeal followed, and we now affirm.

## I. HISTORY

Reinke is in the business of installing insulation at construction projects. From about July 1998 to January 2001, it was a member of the Residential Construction Employers Council ("RCEC"). The RCEC is a multi-employer bargaining association. The Union prefers to negotiate with an association such as the RCEC, rather than negotiate with employers individually. The relevant agreement in effect between Reinke and the Union was a product of Reinke's membership in the RCEC.

Reinke decided to withdraw from the RCEC (and then negotiate with the Union individually) and gave the Union notice thereof on January 26, 2001. At or after this time, the Fund decided to audit Reinke's contributions of pension and welfare benefits to ensure compliance with the collective bargaining agreement. The results of the audit were not positive. A preliminary report opined that Reinke was delinquent in the amount of $142,441.24, and that Reinke was in "material noncompliance" with its obligations toward the Fund. The report also noted that the auditor had been

unable to retrieve certain essential records because Reinke had "denied . . . access." The auditors also stated, "We believe that our examination provides a reasonable basis for our opinion."

The preliminary report also emphasized what its description indicates; namely, that the report was *preliminary* and not final. Moreover, it stated that it was intended to be used by the Fund and not to be a legal determination of Reinke's compliance, and that due to the use of alternate procedures its results should be considered "QUALIFIED."

Preliminary or not, the Fund began the lawsuit leading to *Reinke I* on October 22, 2001, based upon the report. The day after that suit was filed, the Union started to picket Reinke at its various job sites with signs accusing Reinke of failure to make fringe benefits contributions. The Union had never before picketed on the basis of a preliminary report alone, and it had not picketed in the past when preliminary audits of Reinke's books found delinquencies. The Union representative responsible for ordering the picketing against Reinke, Bill Rabinak, had, however, expressed as far back as 1998 his intent to "infiltrate and destroy" companies that cheated on their contributions, companies that Rabinak deemed "bottom feeders." These comments from 1998 were not directed toward Reinke. The picketing was done at Reinke's job sites and initially led to some nonunion workers of Reinke's refusing to work. Another consequence, of which the Union was aware, was that Reinke lost business. Various homeowners terminated their contracts with Reinke because of the picketing.

Reinke tried some attempts to make peace with the Union. It hired its own auditor, who concluded that Reinke owed nothing, but the Union would not consider that report. Reinke also tried to make clear that any of its records were available for review by the Fund's auditor. Moreover, Reinke offered to pay all the disputed contributions in

exchange for the cessation of the picketing. That offer was conditioned, however, on Reinke retaining the right to contest the amounts owed in court. The Union rejected that offer and continued picketing.

Reinke then successfully sought relief from the NLRB, which petitioned to enjoin the Union's picketing. A magistrate judge agreed, and issued a temporary restraining order prohibiting the Union from picketing Reinke. The Union ceased picketing, but began distributing handbills. The handbills included comments such as, "The **HARD** working employees of Reinke have been cheated on their **MEDICAL** and **RETIREMENT** contributions!"

The preliminary report was eventually superseded by a final report, which contained similar findings. Within a few months of that report, Judge Andersen informed the parties of his ruling on the Fund's claims against Reinke. Judge Andersen found that Reinke was not delinquent in any of its contributions (a ruling eventually affirmed in *Reinke I*). The Union immediately ceased distributing handbills.

## II.  ANALYSIS

We review the grant of summary judgment de novo, viewing all facts in the light most favorable to Reinke, the nonmoving party. *See Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005). Reinke's claims can be grouped as follows: Counts 2-4, alleging state law claims of defamation, false light and trade libel; Counts 5-6, and 8, alleging tortuous interference and violations of the Illinois Consumer Fraud Act ("ICFA"); Count 7, alleging violations of § 303 of the Labor Management Relations Act; and, finally, Count 9, alleging violations of Illinois's Uniform

Deceptive Trade Practices Act ("UDTPA").[1]

### A. Actual Malice: Counts 2-4

Reinke concedes that it cannot prevail on its defamation claims without first showing that the Union acted with actual malice. *See Linn v. United Plant Guard Workers of Am.*, 383 U.S. 53, 61 (1966) (holding as preempted all defamation actions in labor disputes except those published with actual malice). Actual malice, or *"New York Times* malice," requires that the party making a defamatory statement do so "'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Old Dominion Branch, No. 496 Nat. Assn. of Letter Carriers v. Austin*, 418 U.S. 264, 281 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). Reinke argues that the Union acted with reckless disregard for the truth when it asserted that Reinke cheated its employees out of benefits. The question for us is not whether a reasonable person would have found it prudent to accuse Reinke of cheating, but whether there is "sufficient evidence to permit the conclusion that the [Union] in fact entertained serious doubts as to the truth of [its] publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or whether there is sufficient evidence to show that the Union had a "'high degree of awareness of . . . probable falsity,'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). The evidence must be sufficient to "support a reasonable jury finding . . . that the plaintiff has shown actual malice by clear and convincing evidence." *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1317 (7th Cir. 1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986)).

---

[1] Count 1 was voluntarily dismissed prior to summary judgment.

Reinke relies on a number of pieces of circumstantial evidence to support its case: the Union's reliance on a mere preliminary report that was qualified and based upon incomplete records; the Union's deviation from normal practices (the Union had not previously picketed on the basis of preliminary reports); the Union's refusal to stop picketing after Reinke's auditor determined the company had paid all it was obliged to; the Union's refusal to stop picketing in the face of Reinke's offer to pay all disputed funds; the Union's use of the term "cheating" instead of "under contribution"; and, finally, the Union's ill will toward Reinke.

Reinke is entitled to prove state of mind with circumstantial evidence like that listed above, but "courts must be careful not to place too much reliance on such factors." *Id.* at 668. Our review of the record as a whole leads us to the conclusion that there is insufficient evidence to allow a finder of fact to conclude the Union acted with actual malice.[2]

The Union's reliance on the preliminary report does not evidence actual malice. While preliminary in nature, and stamped "QUALIFIED," there is nothing in the record to suggest any facially obvious errors in its accuracy. To the contrary, the auditors stated their belief that their examination provided a "reasonable basis" for the conclusion. Moreover, the Union knew the Fund thought it was a reliable enough source for initiating a lawsuit. Reliance on a report expressly noting it is incomplete because of the absence of certain records might, in other circumstances, help support a finding of actual malice. But in this case the absence of the records was attributed by the

---

[2] Accordingly, we need not consider the other dispute between the parties as to this issue; namely, whether the Union's allegation of cheating is an actionable defamatory statement.

preliminary report to Reinke's lack of cooperation. Thus, the missing records reinforce the inference of impropriety on Reinke's part rather than detract from it. We cannot describe reliance on that report as evidence of a reckless disregard of the truth.

The Union's disinterest in Reinke's audit and other efforts to prove that Reinke did not cheat also do not bring us closer to sufficient evidence of actual malice. Yes, the Union refused to consider the opinion arrived at by Reinke's auditor, but that does not evidence a "purposeful avoidance of the truth." *Harte-Hanks*, 491 U.S. at 692. Auditing reports are prepared by licensed professionals for a reason: they involve complex calculations and procedures the untrained person cannot perform. The only information in these reports that matters to most people is the bottom line—whether or not Reinke is short on its payments. The Fund's auditor said Reinke owed money and Reinke's auditor said the opposite. A battle of experts like this tends to show a good faith dispute, not actual malice.

Nor do we find significant the Union's refusal to stop picketing in the face of Reinke's offer to pay the disputed funds. Even putting aside the fact that this offer was qualified by Reinke's reservation to contest the matter in court, offering to pay the funds cures alleged cheating in the same way that a bank robber's offer to give the money back dispels the need for a criminal prosecution. By the time an offer of restitution is made the alleged cheating (or bank robbery) has occurred and paying the money back will not make it go away. To put it another way, the Union could have construed the offer of payment as evidence of a guilty conscience just as easily as it could consider it to be evidence of Reinke's innocence.

Finally, the Union's deviation from its previous practice and its ill will toward Reinke are just more pieces of circumstantial evidence, insufficient without something

more concrete, to show actual malice. *See Harte-Hanks*, 491 U.S. at 665 (explaining that a "plaintiff must prove more than an extreme departure from professional standards and that a [defendant's] motive . . . [cannot] provide a sufficient basis for finding actual malice"). And the Union's use of the term "cheating" instead of a more innocuous term like "failure to contribute," or "undercontribution," is also not sufficient alone, or in combination with Reinke's other evidence, to show actual malice. Many innocent explanations may exist when a company lapses in its obligation to pay welfare benefits, but it does not show actual malice for a union not to give the company the benefit of the doubt. After all, the relationship between organized labor and employers is marked by "intemperate" and "abusive" language, where "epithets such as 'scab,' 'unfair,' and 'liar' are commonplace." *Linn*, 383 U.S. at 60. Our review of the record, taking the facts in the light most favorable to Reinke, and viewing them through the prism of the higher clear and convincing evidence standard, leads us to conclude that there exists no genuine issue of material fact as to actual malice on the part of the Union.

### B. Preemption: Counts 5,6, and 8

The district court held that these state law counts were preempted, but in doing so the court merged distinct preemption doctrines as one. While § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), preempts claims that require interpretation of a collective bargaining agreement, "it is important to remember that *other* federal labor-law principles may pre-empt state law." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409 n.8 (1988) (emphasis added); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (holding § 301 preempts state law claims that are substantially dependent upon analysis of the terms of an agreement made between

the parties in a labor contract). One of these other types of preemption is so-called *Garmon* preemption, which forbids state regulation of conduct that is arguably protected or prohibited by federal law. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959).

On appeal, the Union has made clear that its preemption argument relies on *Garmon* and its progeny.[3] *See Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 241 (7th Cir. 1996) (holding that a tortious interference with contract claim was preempted by *Garmon*). Reinke does not dispute *Garmon*'s preemptive force, but instead argues that its claims fall within an exception to *Garmon* preemption because of the Union's actual malice. *See Keehr v. Consolidated Freightways of Delaware, Inc.*, 825 F.2d 133, 136-37 (7th Cir. 1987) (explaining that a claim for intentional infliction of emotional distress is not preempted by *Garmon* when, among other things, it is "based on 'outrageous' conduct and not simply 'on the type of robust language . . . that may be commonplace in various labor contexts'") (quoting *Farmer v. United Bhd. of Carpenters and Joiners*, 430 U.S. 290, 306 (1977)). We must necessarily reject this argument, as we have already found that the record in this case cannot support such a finding.

## C.  *Section 303 of the LMRA: Count 7*

For this count, the district judge granted summary judgment on the basis that Reinke could not show the Union had engaged in improper activities directed at any secondary employers. *See Mautz & Oren Inc. v. Teamsters, Local No. 279*, 882 F.2d 1117, 1120-21 (7th Cir. 1989). Applying the standards set forth in *Sailors' Union of Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950), the court

---

[3]  We may affirm on any basis present in the record. *Cygan v. Wisconsin Dep't Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004).

found that the Union's conduct in picketing at the job site constituted lawful primary picketing. In its brief before us, the Union echos the district court's ruling and ignores Reinke's argument that the distinction between "primary" and "secondary" picketing analyzed in *Moore Dry Dock* is irrelevant to its claim. According to Reinke, the prohibited object of the Union's picketing was to force Reinke back into the RCEC.

Reinke's claim is brought under § 158(b)(4)(A), which in relevant part states:

> It shall be an unfair labor practice for a labor organization or its agents—

> (4) (I) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

> (A) forcing or requiring any employer . . . to join any labor or employer organization . . . .

29 U.S.C. §§ 158(b)(4)(i)(A), (ii)(A). Reinke's argument is that § 158(b)(4)(A) prohibits picketing directed against a primary employer where an object is to force that employer to join a multi-employer bargaining association, regardless of whether the union also targets secondary employers. Reinke relies primarily on *Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters*, 623 F.2d 1354, (9th Cir. 1980), where the court held that § 158(b)(4)(A) prohibited a strike by a union against Frito-Lay, Inc. where the intent of the union was to force Frito-Lay, Inc. (as well as two other companies) to form a multi-employer bargaining unit. *See*

*Mobile Mech. Contractors Ass'n v. Carlough*, 664 F.2d 481, 484-85 (5th Cir. 1981) (finding § 158(b)(4)(A) violated where a union attempted to force a multi-employer bargaining unit to cede some of its authority to a larger, nationwide multi-employer bargaining unit); *Union De Tronquistas De Puerto Rico, Local 901 v. Arlook*, 586 F.2d 872 (1st Cir. 1978) (affirming an injunction where a union threatened and coerced an employer to become part of a multi-employer association); *see also Musicians Union, AFM Local 6 (Hyatt Regency/Oakland)*, 298 N.L.R.B. 740, 741 (1990) ("Section 8(b)(4)(ii)(A) draws no distinction between primary and secondary picketing."); *Chicago Typographical Union No. 16 (Alden Press, Inc.)*, 151 N.L.R.B. 1666, 1677 n.16 (1965) (same) (citing agency decisions).

Even assuming Reinke's interpretation of § 158(b)(4)(A) is correct, it still cannot prevail. The record in this case does not present a genuine issue of fact as to whether the Union struck with the object of having Reinke return to the RCEC.[4] All this record shows is that after Reinke gave notice of its withdrawal from the RCEC the Fund initiated an audit which led to a lawsuit and the challenged picketing. Reinke asks us to infer from this chain of events—and the fact that the Union had not picketed based upon under contribution deficiencies evidenced only by a preliminary report—that the object of the Union's picketing was to force Reinke to rejoin the RCEC. But we do not think that inference is reasonable based upon all of the evidence. The picketing began the day after the lawsuit was filed,

---

[4] As the party opposing summary judgment on this claim, Reinke was required to " 'set forth specific facts showing that there is a genuine issue for trial.' " *Scaife v. Cook County*, 446 F.3d 735, 740-41 (7th Cir. 2006); *see also Roger Whitmore Auto. Services, Inc. v. Lake County,* 424 F.3d 659, 669 (7th Cir. 2005) (explaining that "speculation or a scintilla of evidence" will not suffice to defeat summary judgment) (citations omitted).

which was nine months after Reinke pulled out of the RCEC. The picketing, and later handbilling, was directed solely at Reinke's alleged failure to make required payments. Reinke points to no evidence whatsoever indicating that the Union would have stopped picketing if Reinke rejoined the RCEC. This set of facts is far removed from *Frito Lay*, where the court found "substantial, although not overwhelming, direct evidence" of the union's motive. 623 F.2d at 1360-61 (explaining that after the break up of the multi-employer association the union continued to try to negotiate "a single contract for all companies," "suggested that the employers 'get together' to come up with common contracts, and went so far as to arrange joint bargaining meetings to be attended by all three employers," while also noting that the Union negotiators admitted the "strategy was to persuade the companies to reinstitute the old employer organization"). The timing and circumstances of the audit and picketing in relation to Reinke's withdrawal from the RCEC are insufficient to support the inference that the Union picketed for the object of having Reinke rejoin the RCEC.

### D.  The UDTPA: Count 9

The district court dismissed this count as moot, given that the UDTPA allows only for injunctive relief and by the time summary judgment occurred all picketing and handbilling had stopped. Reinke finds error in this ruling, arguing that the UDTPA also allows for attorney's fees, which would be a valuable remedy. Reinke does not explain how it can be awarded attorney's fees when no substantive relief is available under the statute. Reinke, in effect, tells us we can read the fee-shifting provision of this statute as a stand alone remedy, an argument we have great difficulty understanding, let alone accepting. In any event, Reinke's claim under this statute is premised on its ability to show the

Union disparaged it on the basis of "false or misleading representation[s] of fact." 815 ILCS 510/2(a)(8). Success on this claim would require actual malice, *Linn*, 383 U.S. at 61, a showing Reinke cannot make.

### III.  CONCLUSION

For the foregoing reasons, the grant of summary judgment is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*