Opinion by Judge GOULD; Concurrence by Judge FISHER; Partial Dissent by Chief Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge REINHARDT.
OPINION
GOULD, Circuit Judge:
We must decide whether an agreement among competitors to share revenues during the term of a labor dispute is exempt from the antitrust laws under the non-statutory labor exemption, and if not, whether the agreement should be condemned as a per se violation of the antitrust laws or on a truncated “quick look,” or whether more detailed scrutiny is required. We conclude that the agreement is not immune from the antitrust laws, but that summary condemnation, whether as a per se violation or on a “quick look,” is improper. We affirm the district court.
I. Factual and Procedural History
In the fall of 2003, the collective-bargaining agreement between several local chapters of the United Food and Commer *1123 cial Workers (“UFCW”) and three large supermarket chains operating in Southern California (Albertson’s, Ralphs, and Vons, a subsidiary of Safeway, Inc.) was set to expire. Another grocery chain, Food 4 Less,[1] had a separate contract with UFCW that was set to expire several months later, in February 2004. Before the contracts expired and with the consent of the union, Albertson’s, Ralphs, and Vons formed a multi-employer bargaining unit in the summer of 2003 for negotiation of a successor labor contract.
Albertson’s, Ralphs, Vons, and Food 4 Less (“Defendants” or “grocers”) entered into a Mutual Strike Assistance Agreement[2] (“MSAA”) in September 2003, in anticipation of the potential use of “whipsaw” tactics, where unions exert pressure on one employer within a multi-employer bargaining unit through, for example, selective strikes or picketing. Among other things, the MSAA provided that if one party to the agreement was struck by the union, the other grocers (with the exception of Food 4 Less) would lock out all their union employees within 48 hours.
Pertinent to the antitrust claims that we assess, the MSAA also included a revenue-sharing provision (“RSP”), providing that in the event of a strike/lockout, any grocer that earned revenues above its historical share relative to the other chains during the strike period would pay 15% of those excess revenues as reimbursement to the other grocers to restore their pre-strike shares.[3] The MSAA specified that the strike/lockout period would begin at the start of the week in which the strike/lockout commenced and continue for two weeks following the end of the strike/lockout.[4] According to a responsible grocer executive, the 15% figure was designed to estimate the incremental profit the grocers earned on each additional dollar of revenue.
On October 11, 2003, after union contract negotiations broke down, the unions began a strike against Vons stores in the region. Albertson’s and Ralphs locked out their union employees the next day pursuant to the terms of the MSAA. The unions at first picketed Albertson’s, Ralphs, and Vons stores, but soon elected to pull their pickets from Ralphs stores and focus their picketing efforts on Albertson’s and Vons only. About four-and-a-half months after the strike began, at the end of February 2004, the grocers and the unions reached an agreement and the strike/lockout ended. In accord with the revenue-sharing provision of the MSAA, Ralphs paid about $83.5 million to Vons, and it paid about $62.5 million to Albertson’s.
*1124 While the strike was in progress, the State of California brought an action against the grocers alleging that the RSP violated Section 1 of the Sherman Act, which prohibits any contract, combination, or conspiracy in restraint of trade or commerce.[5] 15 U.S.C. § 1. After limited discovery, the grocers moved for summary judgment on the ground that the RSP was immune from antitrust scrutiny under the non-statutory labor exemption. The district court denied the motion, holding that the exemption was inapplicable. California then moved for summary judgment, contending that the RSP was a per se violation of § 1, or in the alternative that it was unlawful under an abbreviated rule of reason or “quick look” antitrust analysis. The district court denied that motion as well. The grocers renewed their motion for summary judgment on the non-statutory labor exemption, and the district court again denied their motion.
While preserving their right to appeal the district court’s rulings, the parties stipulated to the entry of final judgment for the grocers after California agreed not to pursue the theory that the RSP violated § 1 of the Sherman Act under a full rule of reason analysis, and the grocers agreed not to pursue the various affirmative defenses they had pleaded, with the exception of the non-statutory labor exemption. The district court entered judgment in accordance with the parties’ stipulations.
California timely appealed the final judgment, arguing that the RSP should be condemned as a per se violation or on a “quick look,” and the grocers timely cross-appealed, arguing that the non-statutory labor exemption should apply. We issued an opinion affirming in part, reversing in part, and remanding. California ex rel. Brown v. Safeway, Inc., 615 F.3d 1171 (9th Cir.2010). A majority of non-recused ac-five judges voted to rehear this case en banc pursuant to Circuit Rule 35-3. California ex rel. Brown v. Safeway, Inc., 633 F.3d 1210 (9th Cir.2011).
II. Jurisdiction and Standard of Review
We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court’s denial of summary judgment on the basis of the non-statutory labor exemption. Clarett v. Nat’l Football League, 369 F.Sd 124, 130 (2d Cir.2004). The selection of the proper mode of antitrust analysis is a question of law, which we review de novo. United States v. Brown, 936 F.2d 1042, 1045 (9th Cir.1991); see also Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 772 (8th Cir.2004); XI Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1909b, at 279 (2d ed.2005) (hereinafter Areeda & Hovenkamp).
III. Non-Statütory Labor Exemption
On cross-appeal, the grocers contend that the district court erred in holding that the RSP is not immune from the Sherman Act under the non-statutory labor exemption, and they urge that summary judgment should have been entered in their favor on the basis of the exemption.
A. Background
Courts have recognized both “statutory” and “non-statutory” labor exemptions to the antitrust laws. Phoenix Elec. Co. v. Nat’l Electric Contractors Ass’n, 81 F.3d 858, 860 (9th Cir.1996). The statutory exemption, which is not invoked here, establishes that labor unions are not combinations or conspiracies in restraint of trade and exempts certain union activities from scrutiny under the antitrust laws. *1125 Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 621-22, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). However, the statutory exemption does “not exempt concerted action or agreements between unions and nonlabor parties.” Id. at 622, 95 S.Ct. 1830.
The non-statutory labor exemption, invoked by the grocers as a defense in this case, has been inferred from federal labor statutes. These “set forth a national labor policy favoring free and private collective bargaining,” “require good-faith bargaining over wages, hours, and working conditions,” and “delegate related rulemaking and interpretive authority to the National Labor Relations Board.” Brown v. Pro Football, Inc., 518 U.S. 231, 236, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996). The implicit exemption “interprets the labor statutes ... as limiting an antitrust court’s authority to determine, in the area of industrial conflict, what is or is not a ‘reasonable’ practice” and “substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations” in that area. Id. at 236-37, 116 S.Ct. 2116. “[Sjome restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions” to give effect to federal labor policy and to allow meaningful collective bargaining to occur. Id. at 237, 116 S.Ct. 2116.
“The Supreme Court has never delineated the precise boundaries of the [non-statutory labor] exemption, and what guidance it has given as to its application has come mostly in cases in which agreements between an employer and a labor union were alleged to have injured or eliminated a competitor in the employer’s business or product market.” Clarett, 369 F.3d at 131. The Couid first elaborated on the reach of the non-statutory labor exemption in Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, involving a series of agreements between an electrical workers union and several manufacturers and contractors in which the manufacturers and contractors agreed to do business exclusively with other companies that employed union workers. 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Those agreements were part of “a far larger program ... to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level” and created a “situation ... not included within the [relevant] exemptions.” Id. at 809, 65 S.Ct. 1533. The Court explained that Congress did not intend to bestow on unions “complete and unreviewable authority to aid business groups to frustrate [antitrust legislation’s] primary objective.” Id. at 810, 65 S.Ct. 1533.
In United Mine Workers of America v. Pennington, the Supreme Court similarly declined to apply the exemption to insulate a wage agreement between a union of mine workers and large coal companies. 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The union and the large companies, to eliminate smaller coal companies and permit the larger companies to control the market, agreed to a series of terms, including increased wages for union workers. Id. at 660, 85 S.Ct. 1585. A smaller coal mine operator, unable to pay the increased wages demanded by the union under the terms of their agreement with the larger companies, filed suit claiming that the agreement violated the Sherman Act. Id. at 659, 85 S.Ct. 1585. In exploring the boundaries of the exemption, the Court observed that, had the union and employers entered into an agreement in which they collectively set prices for coal, they could not defend that agreement from antitrust attack, because “the restraint on the product market is direct and immediate, is of the type characteristically deemed un *1126 reasonable under the Sherman Act and the union gets from the promise nothing more concrete than a hope for better wages to come.” Id. at 663, 85 S.Ct. 1585. The Court rejected the argument that, simply because the agreement related to wages— a subject at the heart of bargaining — rather than prices, the exemption should apply. Id. at 664-69, 85 S.Ct. 1585. Though “a union may conclude a wage agreement with the multi-employer bargaining unit without violating the antitrust laws,” the Court explained, “there are limits to what a union or an employer may offer or extract in the name of wages.” Id. at 664-65, 85 S.Ct. 1585. “[A] union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units.” Id. at 665, 85 S.Ct. 1585 (emphasis added). The Court held that the wage agreement was not exempt from the antitrust laws. Id. at 669, 85 S.Ct. 1585.
The exemption was applied in a fractured decision in Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), which the Supreme Court issued together with its opinion in Pennington. The union representing butchers in Chicago reached a collective-bargaining agreement with a multi-employer bargaining unit of food retailers that included a marketing hours restriction, which prohibited the sale of meat before 9:00 a.m. and after 6:00 p.m., and on Sundays. Id. at 679-80, 85 S.Ct. 1607. One member of the bargaining unit, Jewel Tea, initially rejected the provision limiting hours, but eventually decided to sign a contract including such a provision under threat of a strike. Id. at 680-81, 85 S.Ct. 1607. Jewel Tea brought suit against the union, claiming that the marketing hours restriction in the contract violated the Sherman Act as it was the product of a conspiracy to prevent the retail sale of fresh meat during the evening hours. Id. at 681-82, 85 S.Ct. 1607. The plurality opinion explained that “the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions’ successful attempt to obtain that provision ... falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.” Id. at 689-90, 85 S.Ct. 1607. Three other justices, concurring in the judgment (but dissenting in Pennington) viewed the exemption more broadly, and would have held that all “collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act is not subject to the antitrust laws.” Id. at 710, 85 S.Ct. 1607 (Goldberg, J., concurring).
The Court declined to apply the non-statutory exemption to a labor-employer agreement in Connell Construction Co., 421 U.S. at 621, 95 S.Ct. 1830. A union representing workers in the plumbing and mechanical trades in Dallas entered into a multi-employer bargaining agreement with a large group of mechanical contractors. Id. at 619, 95 S.Ct. 1830. The union asked Connell Construction — a general building contractor that was outside the bargaining agreement and whose workers were not represented by the union — to agree to subcontract mechanical work only to firms that had a contract with the union. Id. Connell initially refused to sign the agreement but acquiesced when the unions picketed one of its construction sites. Id. at 620, 95 S.Ct. 1830. The Court recognized the importance of the non-statutory exemption for labor policy, but cautioned that “while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, the nonstatutory exemption offers no similar protection when *1127 a union and a nonlabor party agree to restrain competition in a business market.” Id. at 622-23, 95 S.Ct. 1830 (citation omitted). The exemption did not shield the agreement from the antitrust laws because such a “direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions.” Id. at 625, 95 S.Ct. 1830.
Most recently, in Brown v. Pro Football, Inc., the Supreme Court for the first time extended the non-statutory labor exemption to an agreement that was solely among employers. 518 U.S. at 238, 116 S.Ct. 2116; see also IB Areeda & Hovenkamp ¶ 257b2, at 141 (3d ed.2006) (explaining that “historically the courts were reluctant to extend the exemption ... to an agreement among employers that did not involve any employee group as a participant” but that the Supreme Court did extend the exemption to that situation in Brown); id. at 151-52.
Brown involved an agreement among National Football League teams to restrain the salaries of certain classes of players. Brown, 518 U.S. at 234-35, 116 S.Ct. 2116. The collective-bargaining agreement between the players’ union and the league expired, and bargaining began for a new contract. Id. at 234, 116 S.Ct. 2116. During the negotiations, the NFL adopted a plan that would permit each team to create a developmental squad of rookies who would play in practice games with the team and sometimes in regular games as substitutes for injured players, and provided that the developmental squad players would be paid $1000 per week. Id. The players’ union disagreed with these terms and insisted that developmental squad players get benefits and protections similar to those offered to regular players and that they be free to negotiate their own salaries rather than be paid the fixed rate. Id. Two months later, bargaining reached an impasse, and the NFL unilaterally implemented the developmental squad program under its proposed terms. Id. at 235, 116 S.Ct. 2116. The developmental squad players brought an antitrust action against the league and the individual teams, claiming that the agreement to pay them $1000 per week violated the Sherman Act. Id.
The Court began by examining the “history and logic” of the exemption, observing that it “interprets the labor statutes in accordance with” the intent of Congress to prevent “judicial use of antitrust law to resolve labor disputes” and limits antitrust courts’ authority to determine what qualifies as a reasonable practice in industrial conflict. Id. at 236-37, 116 S.Ct. 2116. With citation to the leading cases Connell, Jewel Tea, and Pennington, the Court explained that the exemption is essential to give effect to federal labor policy and allow meaningful collective bargaining because “it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other any of the competition-restricting agreements potentially necessary to make the process work.” Id. at 237, 116 S.Ct. 2116.
The Court then identified the question presented as one of scope: whether the exemption applies to an agreement among several employers bargaining together to implement after impasse the terms of their last best good-faith wage offer. Id. at 238, 116 S.Ct. 2116. The Court recognized at the outset that labor law “regulates directly, and considerably, the kind of behavior here at issue — the postimpasse imposition of a proposed employment term concerning a mandatory subject of bargaining.” Id. Labor regulations “reflect the fact that *1128 impasse and an accompanying implementation of proposals constitute an integral part of the bargaining process,” and case law demonstrates that implementation of terms after impasse is a familiar practice in multi-employer bargaining. Id. at 239-40, 116 S.Ct. 2116. Under these circumstances, “to subject the practice to antitrust law is to require antitrust courts to answer a host of important practical questions about how collective bargaining over wages, hours, and working conditions is to proceed- — the very result that the implicit labor exemption seeks to avoid.” Id. at 240-41, 116 S.Ct. 2116.
The Court addressed and rejected several proposed limitations or boundaries to the exemption that were suggested by the parties and amici. Id. at 243-50, 116 S.Ct. 2116. The Court first rejected the argument that the exemption should be limited to existing labor-management agreements. Id. at 243-44, 116 S.Ct. 2116. The Court emphasized that, for the immunity to be effective, it must apply not just to the completed bargain but also to the process by which the bargain is made, including the process before an initial collective-bargaining agreement is approved and the period after the agreement has expired. Id.; see also IB Areeda & Hovenkamp ¶ 257b2. The Court rejected the suggestion that the exemption should terminate when collective-bargaining negotiations reach impasse or a reasonable time thereafter and another suggestion that the exemption permit employers to make post-impasse agreements about bargaining tactics but not the terms of any policy directed at employees. Brown, 518 U.S. at 244-48, 116 S.Ct. 2116. The Court also declined to hold that the arena of professional sports is “special” and should be viewed differently than other industries with respect to the antitrust exemption. Id. at 248-49, 116 S.Ct. 2116.
The Court described its decision to apply the exemption to the football teams’ conduct in this way:
That conduct took place during and immediately after a collective-bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship.
Id. at 250, 116 S.Ct. 2116. The Court then clarified that its “holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process.” Id.
B. Positions of the Parties
The grocers contend that Brown immunizes employer agreements related in time and circumstance to the collective-bargaining process, and that the economic weapons parties use to advance their positions in a labor dispute — like an agreement to share revenue to weaken the effects of a whipsaw strike — are “as much a part of the collective bargaining process as are negotiations over terms.” The grocers stress that labor policy approves the use of economic weapons, and that economic weapons are “part and parcel” of the collective-bargaining process that should be exercised free from governmental regulation. NLRB v. Ins. Agents’ Int’l Union, 361 U.S. 477, 489, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).
By contrast, California urges a narrower reading of Brown, one that would permit an exemption for agreements among employers only where “needed to make the *1129 collective bargaining process work,” relying on the Court’s words in Brown. California contends that Brown imposes a multi-factor analysis that takes into account whether the alleged anticompetitive conduct is anchored in the collective-bargaining process, concerns only the parties to the collective-bargaining process, and relates to wages, hours, and conditions of employment or other mandatory subjects of collective bargaining. In California’s view, the RSP was not necessary to allow meaningful collective bargaining to take place and collective bargaining should not be defined so broadly as to include financial weapons like the RSP. The RSP helped the employers to gain advantage in negotiations, but was not integral to the bargaining process. Further, California argues, the RSP does not relate to the core subjects of collective bargaining (wages, hours, and working conditions) and primarily affects a “product market” not a “labor market.” California also notes, as did the district court, that the RSP included an entity that was not a party to the collective-bargaining agreement (Food 4 Less), and that the RSP remained in effect for two weeks after bargaining ended.
C. Exemption Inapplicable
We reject the grocers’ broad reading of the exemption and hold that, under the totality of circumstances here, and in light of the history and logic of the exemption as well as the Supreme Court’s guidance in Brown, application of the exemption to shield the RSP from antitrust scrutiny is not warranted.
The Court in Brown stated, as a premise of its reasoning, that the practice under examination — the unilateral imposition of terms by employers after impasse — was “unobjectionable as a matter of labor law and policy” and that it was regulated “directly, and considerably,” by labor laws. Brown, 518 U.S. at 238, 116 S.Ct. 2116. In other words, post-impasse imposition of terms is not only an accepted practice in labor negotiation, but one that has been extensively regulated and “carefully circumscribed.” Id. By contrast, the use of revenue sharing as an economic weapon during a labor dispute does not enjoy any such endorsement, much less a history of careful regulation, from the realm of labor law and policy. Neither party points to a body of regulatory or judicial decisions that establishes revenue sharing among employers in a bargaining unit as an accepted economic weapon during a labor dispute.[6] From the outset of our analysis, therefore, the RSP is on different footing than the agreement between the NFL club owners in Brown.
Addressing the practice of revenue sharing in the context of multi-employer bargaining, we conclude that the salient con *1130 cerns underlying Brown and central to the history and logic of the exemption are not present here. The agreement to share revenues during and shortly after a labor dispute does not play a significant role in collective bargaining, nor is it necessary to permit meaningful collective bargaining to take place. The RSP does not relate to any core subject matter of bargaining, namely wages, hours, and working conditions, but rather relates principally to the relative revenues of the grocers in the market and the temporary, artificial maintenance of those revenues.
Although it is not an easy question, in our view the grocers cannot succeed in exempting their agreement merely by asserting its value to them and purpose as an economic weapon in the labor dispute over core bargaining subjects. If this were so, a group of employers could claim that fixing prices made them stronger and was useful as an economic weapon in a strike. Quite obviously, that could not be sufficient to gain exemption. It would be like saying “anything goes in a strike context,” and we cannot read Brown so broadly. The RSP was designed to strengthen the grocers’ position in negotiations with the union, but that fact alone does not entitle the agreement to antitrust immunity. Employers might undertake any number of activities to strengthen their bargaining posture and force unions to accept their terms, but the law does not necessarily exempt all such activities.
Our decision not to expand the law of non-statutory labor exemption to shield the grocers from antitrust liability in these circumstances does not place them in an untenable position or “introduce instability and uncertainty into the collective-bargaining process.” Brown, 518 U.S. at 242, 116 S.Ct. 2116. The inability of grocers to enter into an RSP for fear of possible antitrust liability does not hinder the functioning of the collective-bargaining process. Grocers may continue to negotiate terms with the union without an RSP in place and may bring other potent and well-established forms of economic pressure to bear to enhance their bargaining position, including lockouts and the use of replacement workers.
Further, the RSP concerned the “business” or “product” market, rather than the labor market. “The case for the applicability of the non-statutory exemption is strongest where the alleged restraint operates primarily in the labor market and has only tangential effects on the business market.” Am. Steel Erectors, Inc. v. Local Union No. 7, Int’l Ass’n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 79 (1st Cir.2008) (citing Clarett, 369 F.3d at 134 n. 14). Stated another way, and relying on the insights of a perceptive antitrust law commentator, in general, “an agreement among employers restraining a product or nonlabor service market enjoys no labor immunity.”[7] IB Areeda & Hovenkamp *1131 ¶ 257a, at 131; see also Barnett PontiacDatsun, Inc. v. FTC (In re Detroit Auto Dealers Ass’n), 955 F.2d 457, 468 (6th Cir.1992). The RSP, although intended to strengthen the grocers’ position in bargaining for terms related to wages, hours, and working conditions, does not primarily affect the labor market. The fact that the grocers were sharing profits did not have direct consequences for the labor market. This aspect of the RSP lends further support to the view that application of the antitrust laws would not interfere with the bargaining process. While we stop short of endorsing the concept that as a strict rule the non-statutory labor exemption can only arise in a case involving restraint of terms directly relating to labor, that the restraint here is primarily a product market restraint does not encourage application of the non-statutory labor exemption.
Finally, the inclusion of a non-member of the collective-bargaining unit, Food 4 Less, in the agreement to share revenue during the terms of the strike counsels against application of the exemption. The fact that the unilateral post-impasse imposition of terms in Brown “concerned only the parties to the collective-bargaining relationship” appears to have been a significant factor supporting the application of the exemption in that case. Brown, 518 U.S. at 250, 116 S.Ct. 2116. This is logical in light of the purposes of the exemption: the inclusion of non-bargaining employers in an agreement suggests that the conduct is not anchored in the collective-bargaining process and should instead be subject to scrutiny by antitrust laws designed to prevent unreasonable restraints. Here, the grocers offer us the explanation that, as an unincorporated division of Ralphs that was doing business under another name, Food 4 Less needed to be bound by the RSP to make its terms effective. While it may be true that the inclusion of Food 4 Less helped to effectuate the purposes of the agreement, Food 4 Less had a separate contract with the unions that was set to expire at a later date; negotiations for a new agreement were months away. Food 4 Less was not part of the collective bargaining unit, and its inclusion in the RSP, even if helpful to the grocers, suggests that the revenue sharing was not integral to the collective-bargaining process.
The restraint here differs from that in Brown along virtually every dimension that the Court there found significant in addressing the applicability of the exemption: The revenue-sharing provision has not been approved or regulated by labor law, it was not directly related to the collective-bargaining process, it did not concern a matter that the parties were required to negotiate collectively, and it involved a party that was not a member of the collective-bargaining relationship. The RSP is sufficiently “distant ... in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process.” Brown, 518 U.S. at 250, 116 S.Ct. 2116. We decline to read the Supreme Court’s rejection of various limiting principles for the exemption in Brown as an invitation to apply the exemption broadly to any agreement loosely associated in time with bargaining, as the grocers advocate. To protect the employer agreement from antitrust scrutiny in this case would represent a major extension of the non-statutory labor exemption *1132 as described in Brown and, in our view, would run contrary to the history and logic of the exemption. An agreement among employers (some of which are members of a multi-employer bargaining unit and one of which is not) to re-allocate their revenues on a temporary basis to maintain market share while their workers are striking or locked out is not within the core concerns of labor law. Although the arguments advanced by the grocers may be relevant to their position that there was no unreasonable restraint of trade, they are not sufficient to require application of a non-statutory labor exemption.[8] The district court correctly concluded that the grocers’ revenue-sharing agreement is not immune from antitrust scrutiny, and we affirm that conclusion.
We proceed to consider the merits of California’s claim under the Sherman Act.[9]
IV. Antitrust Liability
A. Methods of Antitrust Analysis
Section 1 of the Sherman Act prohibits “[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.” 15 U.S.C. § 1. “Congress designed the Sherman Act as a consumer welfare prescription.” Reiter v. Sonotone Corp., 442 U.S. 330, 343, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (internal quotation marks omitted). “Consumer welfare is maximized when economic resources are allocated to their best use” and when “consumers are assured competitive price and quality.” Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995). “A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law.” Nat’l Collegiate Athletic Ass’n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 107, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Congress sought to ensure that competitors not cut deals aimed at stifling competition and at permitting higher prices to be charged to consumers than would be expected in a competitive environment, or permitting lower prices to be paid to those from whom competitors bought materials than a fair market rate. The touchstone is consumer good. Agreements of competitors, whether express or implicit, whether by formal agreement or otherwise, in restraint of trade are outlawed.
The Supreme Court, has repeatedly recognized that by the language *1133 of the Sherman Act, “ ‘Congress intended to outlaw only unreasonable restraints.’ ” Texaco Inc. v. Dagher, 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006) (quoting State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)). “[M]ost antitrust claims are analyzed under a ‘rule of reason,’ according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors....” State Oil, 522 U.S. at 10, 118 S.Ct. 275. The rule of reason is the presumptive or default standard, and it requires the antitrust plaintiff to “demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive.” Dagher, 547 U.S. at 5, 126 S.Ct. 1276.[10]
“Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se.” State Oil, 522 U.S. at 10, 118 S.Ct. 275. Such restraints “ ‘are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.’ ” Nw. Wholesale Stationers, 472 U.S. at 289, 105 S.Ct. 2613
(quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). Per se treatment is proper only “[o]nce experience with a particular kind of restraint enables the [c]ourt to predict with confidence that the rule of reason will condemn it.”[11] Arizona v. Maricopa Cnty. Med. Soc’y, 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). “[A] ‘departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing.’ ” Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 887, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (second alteration in original) (quoting Cont’l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58-59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). To justify per se condemnation, a challenged practice must have “manifestly anticompetitive” effects and lack “any redeeming virtue.” Id. at 886, 127 S.Ct. 2705 (internal quotation marks omitted). The Supreme Court has “ ‘expressed reluctance to adopt per se rules where the economic impact of certain practices is not immediately obvious.’” Dagher, 547 U.S. at 5, 126 S.Ct. 1276 (quotation marks and ellipses omitted) (quoting State Oil, 522 U.S. at 10, 118 S.Ct. 275).
*1134 “[A] certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive.” XI Areeda & Hovenkamp ¶ 1911a, at 295-96. Stated another way, the rule of reason analysis can sometimes be applied “ ‘in the twinkling of an eye.’ ” NCAA, 468 U.S. at 109 n. 39, 104 S.Ct. 2948 (quoting Phillip Areeda, The “Rule of Reason” in Antitrust Analysis: General Issues 37-38 (Federal Judicial Center, June 1981)). The Supreme Court explained in California Dental Ass’n v. FTC that this truncated rule of reason or “quick look” antitrust analysis may be appropriately used where “an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.” 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). “The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one.” Id. at 781, 119 S.Ct. 1604. Full rule of reason treatment is unnecessary where the anti-competitive effects are clear even in the absence of a detailed market analysis. See NCAA, 468 U.S. at 110, 104 S.Ct. 2948. But if an arrangement “might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,” then a “quick look” form of analysis is inappropriate. Cal. Dental Ass’n, 526 U.S. at 771, 119 S.Ct. 1604.
“[T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment.” Id. at 780-81, 119 S.Ct. 1604. Instead, to borrow Justice Souter’s phrase, there should be “an enquiry meet for the case” that looks to “the circumstances, details, and logic of a restraint.” Id. at 781, 119 S.Ct. 1604. “[I]n any rule of reason case the amount and type of evidence necessary to prove illegality varies with the amount of power that is apparent, with the nature and plausibility of proffered defenses, and with the judge’s evaluation of the degree of harm posed by the restraint.” XI Areeda & Hovenkamp ¶ 1911a, at 296.
B. Per Se Treatment
California characterizes the RSP as (1) a profit-pooling agreement and (2) a market-allocation agreement, and urges that prior judicial experience with these categories of restraints requires per se condemnation of the RSP. We disagree. Given its distinguishing attributes, the RSP cannot be placed in either category of per se illegal restraints.
1. Profit-Pooling
California first argues that the RSP is “nearly identical” to the profit-pooling arrangement invalidated in Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). In that case, the two daily newspapers operating in Tucson, Arizona, entered into an agreement designed to “end any business or commercial competition” between them. Id. at 134, 89 S.Ct. 927. The newspapers agreed to consolidate their production, distribution, advertising, and most management operations in a jointly-held entity, to fix prices, and to refrain from engaging in any competing businesses. Id. The agreement also provided that all profits realized by the papers would be pooled and distributed pursuant to an agreed ratio. Id. The agreement was to continue in force for twenty-five years and was later extended to fifty years. Id. at 133, 89 S.Ct. 927. The Court held that the *1135 § 1 violations of the agreement were “plain beyond peradventure,” and that “[pjooling of profits pursuant to an inflexible ratio at least reduces incentives to compete for circulation and advertising revenues and runs afoul of the Sherman Act.” Id. at 135, 89 S.Ct. 927.
Contrary to California’s assertions, the RSP differs from the profit-pooling arrangement condemned in Citizen Publishing in significant ways, precluding per se treatment of the RSP. First, the agreement among the grocers stated that sharing of revenues would occur during the period of the labor dispute and for two weeks thereafter. The RSP, by its design, was of both limited and unknown duration. The revenue sharing would terminate two weeks after the resolution of any labor dispute, and this “triggering” event for the expiration of the agreement could occur at any time. While the agreement in Citizen Publishing was scheduled to last for fifty years and could be terminated only by mutual consent of the parties, id. at 133, 89 S.Ct. 927, the RSP could end at any time— as soon as the labor dispute was resolved.[12] Indeed, the parties to the agreement could not know in advance how long the labor dispute would continue. The RSP lasted about five months.
This temporary and short-term feature of the RSP distinguishes the grocers’ agreement from the profit-pooling condemned in Citizen Publishing in a way that is relevant to the key question of whether the RSP is a per se unreasonable restraint on trade, with a “predictable and pernicious anticompetitive effect.” State Oil, 522 U.S. at 10, 118 S.Ct. 275; see also Freeman v. San Diego Ass’n of Realtors, 322 F.3d 1133, 1150-51 (9th Cir.2003) (observing that per se rules are inappropriate in novel contexts and rejecting an argument against application of a per se rule because alleged novelty in the restraint was not relevant to issue of competitiveness). Because the RSP was of indefinite but temporary duration, the grocers retained incentives to compete during the labor dispute period. See XI Areeda & Hovenkamp ¶ 1906a, at 236, 238-39 (observing that, in most cases, courts assess “likely” effects to determine if a restraint is “naked” and subject to per se condemnation). Unlike the Citizen Publishing arrangement, which insulated the newspapers from competition by pooling profits for decades and left no reason to compete for customers, the unknown duration of the RSP, the strike-induced nature of the agreement, and the fact that it could end at any moment suggest that the grocers had a continued interest in maintaining and growing their customer bases. Temporary revenue sharing likely did not blunt the grocers’ incentives to advertise, discount, and provide quality service. Grocers retained incentives to prevent the loss of customers during the strike, who might not return after switching to a competitor, and they also had incentive to win new customers that might return as regular customers after the strike ended.[13] Because the RSP was of a necessarily limited duration, the grocers’ interest in preserving customer loyalty and maintaining or expanding market share likely persisted during the revenue-sharing period.[14]
*1136 Second, the RSP differs from the profit-pooling arrangement condemned in Citizen Publishing in that it did not include all of the grocers operating in the region. In Citizen Publishing, the only two daily newspapers in Tucson agreed to pool profits pursuant to an inflexible ratio. 394 U.S. at 134-35, 89 S.Ct. 927. As California concedes, the combined sales of the grocers that were party to the RSP accounted for between 54.4% and 65.1% of the grocery market in the Los Angeles-Long Beach metropolitan area, and between 67.1% and 76.0% of the grocery market in the San Diego metropolitan area. While their collective market share was significant, the grocers still faced competition from other retailers such as Stater Brothers, Trader Joe’s, Costco, and Whole Foods. Given the presence of these competitors in the market, there is a significant probability that the grocers retained incentives to continue — or even to increase — discounting and advertising of grocery products to prevent the loss of customers and profits during the strike period, to gain new customers if possible, and to maximize profitability and market share after the strike.
Because the RSP was an agreement among some, but not all, of the competitors in the relevant market, and because by its terms the RSP had a limited and indefinite duration, it evades any “easy label” of “profit-pooling” and cannot sensibly be grouped together with or analogized to the very different arrangement condemned in Citizen Publishing,[15] See Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 8-10, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); United States v. Topeo Assocs., 405 U.S. 596, 607-08, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (“It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act.”). A restraint of this nature has not undergone the kind of careful judicial scrutiny that would support the application of a per se rule. See Top\Co Assocs., Inc., 405 U.S. at 607-08, 92 S.Ct. 1126; Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 844 (9th Cir.1996). Quite apart from the lack of judicial experience with a restraint of this nature, we conclude that the appli *1137 cation of a per se rule is not warranted in this case because the practice of temporary revenue sharing during the duration of a labor dispute among some competitors within a market does not “facially appear[ ] to be one that would always or almost always tend to restrict competition and decrease output.” Broad. Music, 441 U.S. at 19-20, 99 S.Ct. 1551. In light of its particular features and context, the RSP is “ ‘not a naked restraint of trade with no purpose except stifling of competition.’ ” Id. at 20, 99 S.Ct. 1551 (brackets omitted) (quoting White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)).
2. Market Allocation
We also reject California’s attempt to characterize the RSP as a market-allocation agreement. California correctly notes that market-allocation agreements among competitors at the same market level are per se antitrust violations. See United States v. Brovm, 936 F.2d 1042, 1045 (9th Cir.1991). “Classic” horizontal market division agreements are ones in which “competitors at the same level agree to divide up the market for a given product.” Metro Indus., 82 F.3d at 844. But where, as here, “the conduct at issue is not a garden-variety horizontal division of a market, we have eschewed a per se rule and instead have utilized rule of reason analysis.” Id. California argues that the RSP “mirrors” market-allocation agreements because it divides up the Southern California market according to the participants’ relative market shares. But California concedes that the RSP did not “prevent any Defendant from actually making sales” to consumers. California does not assert that the RSP restricted customers from patronizing certain grocers. Moreover, the agreement did not prevent the grocers from selling any particular products, or limit the grocers to a particular set of customers or geographic regions. The RSP cannot be characterized as a per se illegal market-allocation agreement.
C. “Quick Look”
We next address whether summary condemnation of the RSP on a truncated rule of reason or “quick look” is or is not correct. We conclude that a “quick look” conclusion of antitrust illegality is here inappropriate. This is so for many of the same reasons that per se treatment is not correct. The unique features of the arrangement among the grocers — its limited duration and the existence of other significant external competitors in the market — and the uncertain effect these features had on the grocers’ competitive behavior and incentives during the revenue-sharing period render any anticompetitive effects of the RSP not obvious.
To reach a confident conclusion on the anticompetitive effects of the RSP, further development of the record is required. One might want to permit expert testimony and examine facts about the degree to which the challenged revenue-sharing agreement may have suppressed incentives of the grocers to discount and otherwise compete for customers. One might want to have an understanding of the market impact of other competitors, not in the defendant group, whose pricing and terms of sale would have to be taken into account in a competitive market. It might be helpful to have an understanding whether other competitors were waiting in the wings to exploit any anticompetitive market by their entry, whether these potential new competitors were overseas, or in other regions of the United States, or were skilled in the developing concept of internet marketing of groceries or other novel techniques that might impose mar *1138 ket pressures. Any of these inquiries might inform an evaluation whether, during the relevant period of its operation, the revenue-sharing provision had any anticompetitive effect. On a “quick look,” none of this can be ascertained with reliability.[16]
The features of the RSP described in connection with the per se mode of analysis not only separate it from traditional per se illegal categories of restraints and prevent characterization as a “naked” restraint on price or output, but they also raise sufficient doubt about the anticompetitive nature of the agreement such that detailed scrutiny is required to understand its effects. Because “empirical analysis is required to determine [the] challenged restraint’s net competitive effect, neither a per se nor a quick-look approach is appropriate because those methods of analysis are reserved for practices that facially appear to be ones that would always or almost always tend to restrict competition and decrease output.” Salvino, Inc., 542 F.3d at 340 n. 10. (Sotomayor, J., concurring) (internal quotation marks and brackets omitted).
To use the “quick look” approach, we must first determine whether “an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.” Cal. Dental Ass’n, 526 U.S. at 770, 119 S.Ct. 1604. Once it is established that the restraint is inherently suspect and the anticompetitive effects are easily ascertained, id., then the burden shifts to the grocers to produce evidence of procompetitive justification or effects and thus demonstrate the need for more extensive market inquiry, id. at 775, 119 S.Ct. 1604; see also XI Areeda & Hovenkamp ¶ 1914d, at 354-55. The features of the RSP — its limited, indefinite duration and the presence of other competitive firms in the market— strongly suggest that the agreement “might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition.”[17] Cal. Dental Ass’n, 526 U.S. at 771, 119 S.Ct. 1604.
“Where, as here, the circumstances of the restriction are somewhat complex, assumption alone will not do.” Id. at 775 n. 12, 119 S.Ct. 1604. The particular features and context of the RSP are more than mere idiosyncracies: they warrant further development of evidence and more rigorous review. See XI Areeda & Hovenkamp ¶ 1911a, at 295. Because we cannot reach a confident conclusion that the principal tendency of the RSP is to restrict competition, truncated review is inappropriate.
Can it be successfully argued, to the contrary, that because the RSP reduces the monetary risks of lost sales to participating grocers during a whipsaw strike, it is irretrievably anti-competitive in effect? We conclude that such an argument fails. If a competitor finds itself the target of a strike, which would cause it to lose sales to other competitors, then revenue sharing provides some cushion from the damaging monetary impact of the strike. But it is by no means “obvious” that the grocers that entered into the RSP would be motivated to reduce their competition on price. *1139 Although the immediate monetary risk of losing sales to competitors during a labor strike is reduced by revenue sharing, the remaining risks are still such that a rational competitor would be expected to continue to compete vigorously. While it is true that the arrangement provides a cushion that may arguably affect incentives to compete, that alone, absent evidence of actual anticompetitive impact on pricing, is not sufficient for us to resolve the RSP issue on a “per se” or “quick look” or any other abbreviated basis.
In light of the novel circumstances and uncertain economic effects of the RSP, we conclude that the district court correctly determined that it should follow the presumptive rule of reason. See Cal. Dental Ass’n, 526 U.S. at 781, 119 S.Ct. 1604. Before the challenged revenue-sharing agreement technique is outlawed for use during a labor dispute, there should be open discovery and fair consideration of all factors relevant under the traditional rule of reason test, so as to determine if there are significant anticompetitive impacts and if so whether they outweigh any legitimate justifications. Application of the traditional rule of reason is not a simple matter, but it does permit the type of fundamental analysis appropriate for antitrust law evaluation, and it has stood the test of time.
V. Conclusion
We hold that the agreement between the grocers to share revenues for the duration of the strike period is not exempt from scrutiny under the Sherman Act, and that more than a “quick look” is required to ascertain its impact on competition in the Southern California grocery market. Given the limited judicial experience with revenue sharing for several months pending a labor dispute, we cannot say that the restraint’s anticompetitive effects are “obvious” under a per se or quick-look approach. Although we conclude that summary condemnation is improper, we express no opinion on the legality of the arrangement under the rule of reason.[18]
AFFIRMED.

. Food 4 Less is an unincorporated operating division of Ralphs; it is a fictitious name under which Ralphs does business in Southern California.

. There were in fact two agreements with identical terms, one pertaining to UFCW Local No. 770 and the other to UFCW Locals No. 135, 324, 1036, 1167, 1428, and 1442. We will refer to them as one agreement for simplicity.

. To implement this arrangement, the grocers agreed to submit their weekly sales data for an eight-week period before the strike and for the strike period to a certified public accountant. The CPA would use the data to determine the grocers’ historical percentage shares of the market (relative to one another) prior to the strike, and to calculate the aggregate increase or decrease in each grocer’s average weekly sales during the strike. The CPA would then multiply the total amount of disparity for each grocer by 15% and those grocers earning revenues above their historical share would pay that amount in compensation to the lower performing grocer to return all grocers to their relative pre-strike positions. Food 4 Less and Ralphs were treated as one unit for purposes of this calculation.

.The parties refer to this as the “two-week tail.”

. California sought a permanent injunction and attorneys’ fees.

. The grocers rely on a decision from the Denver region of the NLRB, suggesting that a similar revenue sharing provision was a permissible practice, see Supp. Excerpts of Record (Vol.3) 429-32, and on two courts of appeals decisions, Air Line Pilots Ass’n International v. Civil Aeronautics Board, 502 F.2d 453, 456-57 (D.C.Cir.1974) (holding that revenue sharing among airline employers did not violate the Railway Labor Act) and Kennedy v. Long Island Rail Road Co., 319 F.2d 366, 368 (2d Cir. 1963) (holding that a joint strike insurance plan among leading railroads did not violate the Railway Labor Act, the Interstate Commerce Act, or the Sherman Act), for the proposition that revenue sharing is an accepted economic weapon. But a decision of a regional NLRB tribunal and the two appellate cases implicating, respectively, a different statutory regime and a different type of arrangement, are not sufficiently prevalent authority to demonstrate the acceptability of the practice. To the contrary, these few cases show that revenue sharing in this context is sufficiently rare that it has not been widely examined by agencies and courts as a labor practice.

. The grocers argue that the distinction between agreements affecting business or product markets and those affecting labor markets is no longer relevant to the non-statutory labor exemption analysis following Brown. The Court did not expressly address the significance of the distinction in deciding Brown. The D.C. Circuit below had held that the exemption waives antitrust liability for restraints on competition that "operate primarily in a labor market characterized by colleclive bargaining,” but the Supreme Court chose to interpret the exemption more narrowly. Brown, 518 U.S. at 235, 116 S.Ct. 2116 (quoting Brown v. Pro Football, Inc., 50 F.3d 1041, 1056 (D.C.Cir.1995)). At no point did it explicitly reject the product market/labor market distinction or question its earlier cases that relied in part on the distinction. Id. at 236, 237, 116 S.Ct. 2116 (citing Pennington, 381 U.S. at 657). Brown suggests that the distinction may not be central to the *1131 analysis in all cases, but we conclude that it remains a relevant consideration in determining whether a restraint "plays a significant role in a collective-bargaining process that itself constitutes an important part of the Nation’s industrial relations system." Brown, 518 U.S. at 240, 116 S.Ct. 2116. Other circuits are in accord. E.g., Am. Steel Erectors, 536 F.3d at 79; Clarett, 369 F.3d at 134 n. 14.

. We are reluctant to expand the non-statutory exemption beyond the scope of Brown without further guidance from the Supreme Court. See Brown, 518 U.S. at 250, 116 S.Ct. 2116 (noting that its holding was “not intended to insulate from antitrust review every joint imposition of terms by employers,” but that it "need not decide in this case whether, or where, within these extreme outer boundaries to draw that line”).

. Chief Judge Kozinski's partial dissent contends that, in light of the stipulations of the parties, our ruling on the non-statutoiy labor exemption is “very likely” an advisory opinion and beyond the scope of our jurisdiction. That position does not present a correct view of our Article III jurisdiction, and would seem to foreclose ruling on many issues squarely presented. The issue of whether the RSP is exempt from antitrust scrutiny — which was expressly ruled on by the district court and preserved for appeal by the parties — is a threshold question that logically precedes our examination of the antitrust issues. If in addressing the exemption we determined that the RSP should be insulated from antitrust review, there would be no need to consider whether the RSP could be condemned with a per se rule or under "quick look” analysis. We properly may determine whether the antitrust regime applies at all before we rule on the merits of the antitrust claim.

. As we have previously explained, "[t]he rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. We review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects.” Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1156 (9th Cir.2003) (citing Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 290-93, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (footnote omitted)). The rule of reason is responsible for a sensible application of the antitrust laws that has guided courts for almost a century. See Chi. Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918) (providing the classic formulation of the rule of reason by Justice Brandéis: “The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.”); see also Nat’l Soc’y of Prof l Eng’rs, 435 U.S. 679, 687-91, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); Cont’l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49-50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

. Practices that have been held per se illegal include geographic division of markets and horizontal price fixing. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 315 (2d Cir.2008) (collecting cases).

.While labor disputes are capable of dragging on for months or years, it does not appear that anyone realistically expected the RSP to continue for anywhere near the extended period of time at issue in Citizen Publishing.

. The Supreme Court has recognized that "[t]he retail food industry is very competitive and repetitive patronage is highly important.” NLRB v. Brown, 380 U.S. 278, 284, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

. An agreement of limited and/or indefinite duration could have obvious anticompetitive *1136 effects and violate Section 1, for example, an agreement of competitors controlling most of the market to fix prices for a month to the detriment of consumers. But here, the limited and unknown length of the RSP separates it from a category of restraints with which we are sufficiently experienced to condemn without inquiry into actual competitive harms.

. California offers a series of cases in addition to Citizen Publishing in an effort to demonstrate that profit-pooling arrangements have long been condemned as per se illegal. See, e.g., United States v. Paramount Pictures, Inc., 334 U.S. 131, 149, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (holding that an agreement among five producers of motion pictures and their affiliates to share profits according to prearranged percentages was anticompetitive); N. Sec. Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (invalidating an agreement among stockholders in competing interstate railway companies to form one corporation with a controlling interest in the stock of each railway); Chi., M. & St. P. Ry. Co. v. Wabash, St. L. & P. Ry. Co., 61 F. 993 (8th Cir.1894) (invalidating an agreement among seven competing railroad companies to, among other things, pool gross earnings for a period of twenty-five years); Anderson v. Jett, 89 Ky. 375, 12 S.W. 670 (1889) (voiding a multi-year arrangement between rival steamboat owners to end their rivalry by sharing profits according to fixed percentages). None of these cases, alone or in combination, establishes sufficient judicial experience with a revenue sharing agreement of limited duration, among some competitors in a market, so as to permit per se treatment of the RSP. The fundamental economics of the firms and the public interest do not require per se prohibitory treatment of the challenged practice during a labor dispute.

. Also, if experts gave conflicting views on these subjects, and they were material to resolution, then the decision of the trier of fact might control the outcome.

. The grocers argue that the RSP has pro-competitive benefits in the form of lower prices for consumers as a result of the grocers' ability to negotiate a more favorable contract on labor costs. Because California has not met its burden to show that the RSP is obviously anticompetitive, we need not address the grocers’ procompetitive justifications.

. The ultimate competitive question may not be determined in this case because the State of California, to gain a fined judgment that could be appealed at this time, has stipulated to foregoing its challenge to the RSP under the traditional rule of reason, contending instead that the RSP is invalid per se or on a "quick look.”